705 A.2d 58

Bill ADAMS, et al.

v.

OWENS–ILLINOIS, INC., et al.

No. 1167, Sept. Term, 1996.

Court of Special Appeals of Maryland.

Jan. 29, 1998.

396

Harry Goldman, Jr. (Goldman, Skeen & Wadler, P.A., on the brief), Baltimore, for Appellants.

B. Ford Davis, Whiteford, Taylor & Preston, Baltimore, for ACandS, Inc.

Edward F. Houff, Church & Houff, P.A., Baltimore, Michael N. Weathersby, Evert & Weathersby, Atlanta, GA, for Foster Wheeler Corp. and Foster Wheeler Corp.

John P. Sweeney, Miles & Stockbridge, Baltimore, for Owens Corning.

Douglas D. Connah, Jr., Craig E. Smith, Venable, Baetjer and Howard, Baltimore, for Bethlehem Steel Corp.

Donald S. Meringer, Danaher, Tedford, Lagnese & Neal, P.C., Baltimore, for Pittsburgh-Corning Corp.

Deborah L. Robinson, Kenny, Vettori & Robinson, P.A., Baltimore, for John Crane Inc.

Robert L. Lynott, Thomas & Libowitz, P.A., Baltimore, for Hopeman Bros., Inc.

Warren N. Weaver, Thurman W. Zollicoffer, Jr., Whiteford, Taylor & Preston, Baltimore, for Porter Hayden, Inc.

Argued before DAVIS and SALMON, JJ., and JAMES S. GETTY, Judge (retired), Specially Assigned.

JAMES S. GETTY, Judge (retired), Specially Assigned.

This is an appeal from jury verdicts in nine asbestos cases that were consolidated for trial in the Circuit Court for Baltimore City. The trial judge (Pines, J.) also consolidated 159 additional asbestos cases involving eleven corporate defendants. The verdicts at trial, therefore, were binding as to negligence and product liability in all of the consolidated cases.

The complexity of the cases is best illustrated by the length of the trial. The plaintiffs' cases consumed forty-two trial days, and the defendants' presentation lasted nineteen days. The entire case, from jury selection until the verdicts were rendered, lasted approximately six months, beginning January 17, 1995, and ending July 26, 1995. The jury deliberated for fifteen and one-half hours over a three-day period.

The plaintiffs and their alleged asbestos-related diseases were:

1. Estate of George Best and surviving widow, Almetta Best, laryngeal cancer.

2. Thomas Birchett and Louise Birchett, lung cancer.

3. Estate of Abram Hedges and surviving widow, Marie Hedges, lung cancer.

4. Estate of Hody Ruffin, colon cancer.

5. Dominic and Dossie D'Amico, asbestosis.

6. Edwin Wild and the Estate of Mary Wild, asbestosis.

7. Claim of Edwin Wild, Estate of Mary Wild and Edwin Wild, surviving husband, mesothelioma—death by household exposure.

8. Estate of Phillip Parsons and Elsie Parsons, surviving widow, mesothelioma.

9. Estate of Charles Drebing and Mildred Drebing, surviving widow, mesothelioma.

The jury returned verdicts for the defendants in the first seven cases set forth above, and plaintiffs' verdicts in cases numbered eight and nine. The damages awarded in the Parsons case included no damages for wrongful death, and $86,000 in the estate case. In Drebing, the jury allowed compensatory damages in the amount of $112,500 to Mildred Drebing. In the Personal Representative's case, no damages were awarded for pain and suffering, or for medical and funeral expenses. Appellants allege that the defendants had agreed to the $2,000 statutory amount of funeral expenses,

and that $42,981 in medical bills for Drebing's last illness were proved.[1]

The verdicts on liability as to the defendants are as follows:

| | |
|---|---|
| AC & S, Inc. | Negligent, not strictly liable |
| Armstrong | Not negligent, not strictly liable, but whose asbestos products were a substantial factor in causing Parsons's and Drebing's mesothelioma. |
| Foster Wheeler | Not liable. |
| GAF Corporation (cross-defendant) | Negligent, not strictly liable. |
| Hopeman Bros. | Not liable. |
| Owens–Corning | Negligent, strictly liable. |
| John Crane, Inc. | Not liable. |
| Pittsburgh Corning | Negligent, not strictly liable. |
| Porter–Hayden | Negligent, not strictly liable. |
| Owens–Illinois (cross-defendant) | Negligent, strictly liable. |
| Fibreboard Corporation (cross-defendant) | Not liable. |
| Combustion Eng. (cross-defendant) | Not liable. |
| Babcock & Wilcox | Not liable. |
| Bethlehem Steel | Not liable (in the Mary Wild domestic exposure case only). |

Appellants allege that they have appealed because of "flagrantly unjust and conflicting verdicts directly attributable to gross errors committed by the trial court in jury selection, which led to the open alienation, disaffection, and hostility of jurors being visited upon the plaintiffs." Specifically, appellants raise the following issues, which we have rephrased in a more neutral fashion:

1. Whether the trial court abused its discretion in denying appellants' motion to strike, for cause, potential jurors Nos. 1, 3, 24, and 67.

2. Whether appellants were deprived of allotted peremptory strikes by the court's denial of appellants' motion to strike the above-named jurors for cause.

---

**1.** The deaths of Parsons and Drebing were conceded to be caused by mesothelioma from inhalation of asbestos. The punitive verdict was stricken because punitive damages cannot be awarded in a wrongful death action. In the Parsons case, Owens–Corning was found liable for punitive damages in the wrongful death case only.

3. Whether the court erred in denying appellants' motion for new trial, which was based upon:

 a. Errors in jury selection,

 b. Irreconcilable contradictions and confusion in jury verdicts,

 c. Failure to grant new trials in the seven cases where no recovery was awarded.

4. Whether the court erred in denying a motion for new trial as to all appellants against Bethlehem Steel, Hopeman Brothers, and Foster Wheeler.

5. Whether the court erred in admitting testimony and exhibits concerning communication and knowledge of labor unions as to the dangers of asbestos.

### Jury Selection

Jury selection began on January 17, 1995, and continued for three days. The array consisted of 88 potential jurors. From that number, six jurors were selected to hear the case and eight alternates were chosen. Each side was allotted seven strikes. Of the fourteen jurors originally chosen to hear the case, five were excused after they were seated. Juror No. 1, an athletic coach at McDonough School, was excused after five months service, and a Johns Hopkins nurse, juror no. 12, was also excused in the fifth month. One day before jury deliberation was to begin, a kindergarten teacher was excused. Juror no. 11 was excused after two months, and juror no. 14 was excused the day after jury selection. All five had previously requested to be dismissed.

Appellants used four of their peremptory strikes, after unsuccessfully requesting that they be struck for cause, to strike jurors no. 1, 3, 24, and 67. Before discussing the four named jurors struck by appellants, it is important to discuss the method of selection followed by the court in this case. Each juror completed a sixteen-page questionnaire and a separate hardship questionnaire for those who asserted a basis for being excused, followed by three days of individual *voir dire* by counsel and the court. After each individual juror was

examined and then excused from the courtroom, counsel argued challenges for cause and hardship claims.

On January 30, before final selection, the court permitted a number of panelists to express their concerns about serving, followed by further questioning by counsel and argument to the court. After the court considered the status of all potential jurors, the clerk identified the first twenty-eight and the peremptory challenges were then submitted to the clerk. The first six remaining became the primary jurors and the eight remaining were alternates.

■ Under this procedure, the court excused approximately twenty-five of the original panel for hardship or cause. Over the six-month period, the court excused one primary juror and five alternates: three for medical reasons, one to attend a funeral, one as a matter of the court's discretion, and one for hardship (new job) reasons. None of the four about whom appellants now complain served as a primary or alternate juror. Appellants did not object to using their peremptory strikes to eliminate these four jurors on January 30, when they made their strikes; neither did they seek to explain how they would have exercised their strikes but for the court's refusal to dismiss them for cause.

■ The trial court's ruling on jury composition is reviewable on appeal only for an abuse of discretion. *State v. Cook,* 338 Md. 598, 659 A.2d 1313 (1995). We defer to the trial judge's unique opportunity to observe the demeanor and suitability of potential jurors. *Gorman v. State,* 67 Md.App. 398, 409, 507 A.2d 1160 (1986). None of the four challenged jurors stated that he or she would be unable to judge the case fairly and impartially based upon the evidence. Under Maryland law, a juror must be discharged for cause only when that juror cannot be impartial. *King v. State,* 287 Md. 530, 535, 414 A.2d 909 (1980). In *McCree v. State,* 33 Md.App. 82, 98, 363 A.2d 647 (1976), we stated that a juror may be struck for cause only "where he or she displays a predisposition against innocence or guilt because of bias extrinsic to the evidence to be presented." Although the cases cited are criminal, the same logic

applies to civil cases; the linchpin in either is lack of bias and a resolve to be fair and impartial.

 Appellants argue that the four jurors they struck should have been struck for cause based upon hardship. Under section 8–210(a) of the Md.Code Courts & Judicial Proceedings Article, a juror may be excused by the court where "undue hardship, extreme inconvenience, or public necessity require his excuse. . . ." Significantly, the trial judge, through his personal observation, is able to assess the credibility, demeanor, and fitness of each prospective juror. Judge Pines granted some hardship requests and denied others on an individual basis. The record does not support the suggestion that he abused his discretion in selecting a jury. Appellants, furthermore, raised no objection to the jurors who actually heard the case. In *St. Luke Evangelical Lutheran Church v. Smith*, 318 Md. 337, 344, 568 A.2d 35 (1990), a case involving a procedural irregularity in the distribution of peremptory challenges, the Court said, "In civil cases this court will not reverse for an error below unless the error was both manifestly wrong and substantially injurious." A claim that the jury was not impartial, furthermore, must focus on the jurors who served. *Grandison v. State*, 341 Md. 175, 670 A.2d 398 (1995). Appellants opposed every effort by appellees to obtain a mistrial for juror bias. Clearly, appellants have shown no prejudice in the composition of the jury that did not include the four jurors struck for cause by appellants. Even if it were error not to strike the four jurors for cause, there is no basis for reversal absent a showing of prejudice. We perceive no prejudice in the jury selection process.

### New Trial

 Appellants have maintained throughout the issues they have raised that the jury dissatisfaction with the length of the trial resulted from the court's refusal to advise the jury at the outset of the trial that the case might last five months. On January 26, 1995, prior to the jury being sworn, appellants' counsel filed a Motion to Inform Jurors of Trial Length and Hiatuses. The motion set forth the scheduled dates, begin-

ning with February 13, with the likelihood that only four trial days would be utilized through February 27, followed by a no-court period for two weeks. Thereafter, trial days from March 13 to April 13 would continue on the four day per week schedule. Another no-court period was set in from April 13 to April 24. Appellants requested "full and fair disclosure ... at the outset ... so as to lessen the probability of an unjust verdict rendered by an alienated jury."

The court denied the motion and informed the jurors that they were there "for what we call a protracted case," which is a consolidation of a number of cases, and that the trial "may very well last several months." In June, the court clerk was directed to inquire whether the jury would be amenable to a one-month continuation of the trial from July 1 to August 1. According to appellants, the jury was not told that the request was by the court. The response was a series of letters protesting strongly any further delay in the conduct of the trial, and requesting that the court set a July 31 deadline to complete the trial. The case ended July 27.

Interestingly, appellees made a motion for mistrial after receiving what they perceived to be "those very disturbing 7 letters that we received from the jurors." Appellees all joined in the motion, alleging that "the letters on their face impel the court to grant a mistrial because of the jury's anti-trial, if not anti-defense bias." Of primary concern to appellees were the criticisms leveled at defense counsel for initiating two post-ponements for personal reasons. Appellants, however, argued against granting a mistrial and opposed all requests to voir dire the jury. After the proverbial shoe has fallen, however, the roles are now reversed. Appellants argue that the jury was hostile toward them, and appellees contend that appel-lants cannot now reverse their field. If the current posture of the case proves anything, it would seem to us to establish that Judge Pines was right on each occasion he ruled on the mistrial.

We have reviewed the seven letters and, in our view, they are not as threatening as counsel for the parties perceive them

to be. Juror No. 2, who eventually became the foreperson, requested a deadline for counsel to conclude their arguments and added, "It does not benefit their cases to have hostile jurors hearing them." We do not interpret her comments as an admission that the jurors were currently hostile. Read in conjunction with the preceding sentence requesting a deadline, her later statement may be interpreted to mean that, unless a date of finality is set, a hostile jury might result. Juror No. 2, moreover, included *all* counsel in her comments, without any indication of bias or prejudice toward either appellants or appellees.

Juror No. 6 was understandably concerned over another delay costing her a job she had just started after a three-year effort to find one. She stated that "the lawyers or whomever should suffer as we have been suffering for almost four months. They do not need another vacation since we cannot have one. . . . Please consider talking to the lawyers or who it concerns and encourage or demand them to end this trial by July 27th. . . ." Again, the juror directed her criticism to counsel for both parties. The letter, presumably written early in June, reasonably suggested termination within six or seven weeks, *i.e.,* the end of July.

The remainder of the letters expressed a feeling that the jurors were being treated unfairly by the delays, and that their own lives were being disrupted unnecessarily. We agree with the jurors. Their comments, however, in the court's opinion did not warrant granting a mistrial, which would have meant a waste of four months for all concerned. Instead, the court heeded the message from the jurors and instructed them not to consider the length of the trial in their deliberations. Presumably, they followed the court's instructions.

█ Appellants' next attack on their denial of a motion for new trial relates to the seven plaintiffs who were denied recovery by the jury. We shall address each claim within the precept of *Buck v. Cam's Broadloom Rugs,* 328 Md. 51, 59, 612 A.2d 1294 (1992), which provides that the discretion of a trial judge is at its broadest when a motion for new trial

> ask[s] the trial judge to draw upon his own view of the weight of the evidence; the effect of an accumulation or alleged errors or improprieties by defense counsel . . .; and the allegedly inadequate verdict, in determining whether justice would be served by granting a new trial.

Judge Pines obviously heard all of the testimony and observed the demeanor of all the witnesses.

### ● Dominic D'Amico

Mr. D'Amico was using an oxygen tank when he appeared in court. He alleged that he has asbestosis, a scarring of lung tissue, and pleural plaques, a scarring on the lining of the lung which can be caused by asbestos and may be detected by X-ray or CT scan, but does not generate symptoms.

In contrast to his medical testimony supporting his claim, appellees called a local pulmonologist who attributed D'Amico's condition to emphysema, chronic asthmatic bronchitis and coronary artery disease. None of these conditions, according to the witness, resulted from asbestos. The witness found pleural plaques from radiological studies, but did not attribute any of D'Amico's complaints to that finding. An expert on radiological findings at Johns Hopkins Hospital found no evidence of asbestos in the patient's CT scans, but testified that he observed two tiny plaques which may have been caused by asbestos. The conclusion of these experts was that D'Amico did not have asbestosis, and he did not have diffuse pleural thickening caused by asbestos.

### ● Hody Ruffin

Mr. Ruffin died from prostate cancer. Appellees presented expert evidence that Mr. Ruffin did not have asbestosis or pleural plaque thickening. He had colon cancer, which was not the cause of his death, and the colon cancer was not caused by asbestos.

### ● Abram Hodges

Mr. Hodges claimed that he had asbestosis and lung cancer caused by asbestos. Appellees produced testimony that the

claimant may have had mild asbestosis pathologically, but the fibrosis in his lungs was overwhelmingly siderosis caused by welding fumes. The testimony from appellees' experts was that they detected no clinical or symptomatic evidence that the claimant had asbestosis in his lifetime, and that his lung cancer was attributable solely to his long-term habit of cigarette smoking. He did have cigarette-related emphysema.

## ● Thomas Birchett

Mr. Birchett contended that he had asbestosis and lung cancer from exposure to asbestos. His cancer was surgically removed. Appellees produced evidence that he did not have asbestosis or pleural thickening, and that his lung cancer was caused by cigarette smoking, not by asbestos.

## ● George Best

Mr. Best died from cancer of the larynx. Medical testimony by witnesses for the appellees indicated that asbestos does not cause cancer of the larynx; that the claimant did not have asbestosis; and that the primary risks for his cancer were cigarette smoking and drinking distilled spirits.

## ● Edwin Wild

Four medical experts testified that this 81–year–old claimant did not have clinical evidence of pulmonary asbestosis. They attributed his condition to coronary artery calcification, severe emphysema, and bronchitis. His obstructive airway disease was attributed to smoking cigarettes.

## ● Mary Wild

Mrs. Wild died at age 82. Her asbestosis was alleged to have resulted from handling and washing her husband's clothing. She had no exposure to shipyard asbestos other than through her husband's clothing. Three expert witnesses for appellees testified that Mrs. Wild did not suffer from an asbestos related mesothelioma tumor. No asbestos bodies were detected in the lung tissue; the material detected related to "talc,

mica, or kaolin." Mesothelioma occurs in 20–30 percent of the cases where no asbestos exposure is involved, according to one of appellant's own medical experts.

The credibility of the witnesses was for the jury to determine. *Owens–Corning Fiberglas Corp. v. Garrett,* 343 Md. 500, 522, 682 A.2d 1143 (1996). Appellants had the burden of persuading the jury, by a preponderance of the evidence, that each of them had an asbestos-related disease. *Thodos v. Bland,* 75 Md.App. 700, 542 A.2d 1307, *cert. denied,* 313 Md. 689, 548 A.2d 128 (1988).

From the record, it is abundantly clear that both parties presented expert testimony on the issue of whether any or all of the claimants suffered from an asbestos-related disease. Which experts were more credible was for the jury, not this Court, to decide.

### Inconsistent Verdicts

 Appellants cite the failure of the jury to return consistent verdicts in the Drebing and Parsons cases which, they allege, involved substantially the same exposure to Owens–Corning's products during the same period of time. Appellants are further aggrieved by the "niggardly" amount of damages awarded in the two cases. Although irreconcilably defective verdicts may be subject to rejection, inconsistent verdicts, generally, are not. *See S & R v. Nails,* 85 Md.App. 570, 590, 584 A.2d 722 (1991), "Where the answer to one of the questions in a special verdict form would require a verdict in favor of the plaintiff and an answer to another would require a verdict in favor of the defendant, the verdict is irreconcilably defective." *Accord: Gaither v. Wilmer,* 71 Md. 361, 364, 18 A. 590 (1889).

 Appellants cite no Maryland case that would require reversal for inconsistent verdicts. In *Owens–Corning, supra,* 343 Md. at 521, 682 A.2d 1143, the Court of Appeals stated:

[A] jury's verdict should not be casually overturned. In our system of justice, the jury is sacrosanct and its importance is unquestioned. The members of the jury see and

hear the witnesses as they testify. They watch them as they sweat, stutter or swagger under the pressure of cross-examination.

We agree that the jury gave different amounts in its decisions about the Drebing and Parsons cases, and awarded punitive damages, later struck by the court, in one case and not in the other. The result, however, is not necessarily inconsistent, because they were separate cases, similar, but not identical. In any event, it is not the province of an appellate court to express an opinion regarding the weight of the evidence when reviewing a judgment on a jury verdict. *See Owens–Corning, supra,* 343 Md. at 521, 682 A.2d 1143.

On the common issue verdict sheets, previously set forth herein, appellants advance additional argument relating to inconsistent verdicts. We do not find the claims persuasive, primarily because reviewing the weight of the evidence is not within the province of appellate review. We will review, briefly, the argument by appellants.

The jury found AC & S negligent for its use of block containing asbestos from 1958 to 1970, and negligent for using asbestos pipe covering from 1968 to 1970. Appellants argue that there was no evidence concerning the limited use of pipe covering from 1958 to 1968. Appellants are rehashing the sufficiency or the weight of the evidence as to two different products at two different periods. We reject their argument.

The same argument is raised relating to the time periods in which Owens–Corning and Owens–Illinois were found to be either strictly liable or negligent. As we said previously, evidentiary questions are not a proper subject for our review. A finding of negligent, but not strictly liable, furthermore, has been upheld as not being inconsistent. *See Eagle–Picher Industries, Inc. v. Balbos,* 326 Md. 179, 604 A.2d 445 (1992). The jury may have concluded that

1. A product was not unreasonably dangerous, but the defendant was negligent in not issuing warnings, or

2. A product was unreasonably dangerous, but the defendant breached no duty of care.

Either scenario could result in a determination of negligence not strictly liable, or in a not negligent strictly liable finding without being inconsistent.

### Bethlehem Steel

Appellants seek a new trial against Bethlehem Steel for failure to instruct the jury on the employer's duty to maintain a safe workplace for its employees. Contrary to appellants' claim that this assignment of error was included in their motion for new trial, it was not. Neither was appellants' proposed instruction mentioned in the new trial motion. The court cannot be faulted for failing to grant that which it was never asked to consider.

Judge Pines gave special instructions applicable only to Bethlehem Steel in the Mary Wild case. He said:

Under Maryland law, to establish a cause of action in negligence against Bethlehem, the plaintiffs must prove the existence of all four of the following elements:

One, a duty which Bethlehem owed Mary Wild.

Two, a breach of that duty by Bethlehem.

Three, a legally cognizable causal relationship between Bethlehem's breach of duty and the harm suffered by Mary Wild, and four, damages.

Appellants argue that the court erred in failing to grant Proposed Instruction 44, which states:

An employer has the duty to use reasonable care and diligence to furnish his employees with a reasonably safe place to work.

An employer has the affirmative duty in a master-servant relationship to provide his employee with a reasonably safe place in which to work and to warn and instruct his employee concerning the dangers of the work known to him which are not obvious and cannot be discovered by the exercise of reasonable care by the employee.

Insofar as the instruction was concerned, Edwin Wild was not asserting a claim for injury he sustained.

Therefore, Bethlehem's duty to its employees was not an issue, because Mary Wild was not an employee. Instruction 44 was properly refused. An action in negligence requires a showing of "a legally cognizable duty owed by the defendant to the plaintiff or class of persons of which the plaintiff is a member." *Rosenblatt v. Exxon Co. U.S.A.*, 335 Md. 58, 76, 642 A.2d 180 (1994). "The plaintiff sues in her own right for a wrong personal to herself, and not as the vicarious beneficiary of a breach of duty to another." *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99, 100 (1928). Judge Pines instructed the jury that appellant was required to prove that Bethlehem owed a duty to Mary Wild and breached that duty. If liability for exposure to asbestos could be premised on Mary Wild's handling of her husband's clothing, presumably Bethlehem would owe a duty to others who came in close contact with Edwin Wild, including other family members, automobile passengers, and co-workers. Bethlehem owed no duty to strangers based upon providing a safe workplace for employees.

### Hopeman and Foster Wheeler

Neither Hopeman nor Wheeler manufactured any product containing asbestos. Hopeman was a joiner contractor and Foster Wheeler designed marine boilers. Appellants allege that the court improperly instructed the jury on the law of strict liability as applied to intermediate sellers and installers of asbestos products. Specifically, appellants claim the instruction given "did not equate the liability of an installer, seller, and supplier with the duty of a manufacturer."

Judge Pines advised the jury that

[w]ith regard to strict liability, if a product is defective when sold by a manufacturer . . . and if the product reaches the plaintiff without substantial change, middlemen or other intermediate sellers of the defective product are strictly liable to the plaintiff, just as the manufacturer is liable to the plaintiff.

The court's language is precisely the same as in *Owens–Illinois v. Zenobia*, 325 Md. 420, 601 A.2d 633 (1992). There was no error. Appellants, furthermore, did not preserve this issue for our review. Md. Rule 2–520(e) states that a party may not assign as error the giving or failure to give an instruction unless the party states distinctly the matter objected to, and the ground therefor, immediately after the court instructs the jury. Appellants having made no such objection, there is nothing for us to review.

Assuming for purposes of discussion that the instructions in the liability of manufacturers and non-manufacturers were incorrect, any error would be harmless as to appellants. The jury decided that the products supplied by Foster Wheeler, Hopeman Brothers, and John Crane were not a substantial contributing cause of any injuries allegedly sustained by appellants' exposure to asbestos. The jury also found these three defendants not liable under the negligence and strict liability claims asserted. *See Johnson v. Mitchell Supply*, 33 Md.App. 99, 100, 363 A.2d 657 (1976).

### Knowledge of Unions

██ Appellants' final shot does not revive their request for a new trial. The court allowed appellees to introduce evidence establishing that appellants' union had knowledge of the hazards associated with asbestos. We note that appellants offered into evidence a document published in 1943 by the United States Navy and by the Maritime Commission entitled "Minimum Requirements for Safety and Industrial Health in Contract Shipyards." The document listed asbestos as a hazard that required certain precautions in handling asbestos-containing products. Appellants sought to establish that appellees knew or should have known of the hazards of asbestos as early as 1943, when the documents were published. Appellees were entitled to show that the unions dutifully disseminated this information to their employees together with suggested safety measures for the protection of the workers. Appellees were attempting to show that the absence of a product warning was not a proximate cause of appellants'

injuries, and that the dangers of asbestos were not being kept from the employees. The court, furthermore, limited the use of this evidence by advising the jury that appellees' duty to warn was "non delegable." Judge Pines did not abuse his discretion in allowing the evidence complained of.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**