745 A.2d 457

Gary **BURDETTE** et al.

v.

**ROCKVILLE CRANE RENTAL, INC.** et al.

No. 249, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Feb. 4, 2000.

196

Paul T. Stein (Stein, Sperling, Bennett, DeJong, Driscoll, Greenfeig & Metro, P.C., on the brief), Rockville, for Appellants.

Thomas P. Ryan (Amy Leete Leone and McCarthy, Wilson & Ethridge, on the brief), Rockville, for Appellees.

Argued before KENNEY, BYRNES, and PAUL E. ALPERT (Ret'd, specially assigned), JJ.

KENNEY, Judge.

Gary Burdette and Leslie Burdette appeal from a jury verdict in favor of appellees, John Johnson and Rockville Crane Rental, Inc. Gary Burdette, individually and as the father and next friend of Leslie Burdette, filed a wrongful death and survival action against appellees as a result of the

May 1, 1996, death of Constance Burdette. Constance Burdette, who was Gary Burdette's wife and Leslie Burdette's mother, was fatally injured when her automobile collided with a vehicle owned by Rockville Crane Rental, Inc., and operated by Mr. Johnson.

After a trial in the Circuit Court for Montgomery County, the jury found that (1) Mr. Johnson was negligent in operating appellees' vehicle and (2) Mrs. Burdette was contributorily negligent. Judgment was entered in favor of both appellees.[1]

### The Accident

Mrs. Burdette's usual route to work was to travel along Emory Lane and then turn left onto Muncaster Mill Road. Emory Lane ended at Muncaster Mill Road, forming a "T" intersection. Both roads were two-lane, with one lane in each direction, but both roads had "right-turn only" lanes at the intersection. Emory Lane had a stop sign at the intersection; Muncaster Mill Road had no traffic signal or sign there. The speed limit on Muncaster Mill Road was 40 miles per hour.

On the morning of May 1, 1996, Mrs. Burdette stopped at the stop sign on Emory Lane, with one car stopped in front of her and one behind her. After the car in front turned onto Muncaster Mill Road, Mrs. Burdette moved her white BMW coupe forward past the stop sign and then paused again. Because Muncaster Mill Road had high ground on both sides of it, drivers stopped at the stop sign on Emory Lane could not see as far down Muncaster Mill Road as they could if they advanced past the stop sign. Mrs. Burdette moved forward and paused at the point, approximately 17 feet past the stop sign, at which the pavement of Emory Lane actually intersected with the pavement of Muncaster Mill Road. There were no

---

1. It is noted that the verdict sheet did not address expressly the liability of the corporation. In opening argument, counsel for Mr. Johnson indicated that "he has a crane business. His company is called Rockville Crane Rental, which at the time this accident occurred he was on the job as part of his company." The finding by the jury that Mrs. Burdette was contributorily negligent, however, precluded a judgment against either defendant.

traffic markings or signs where she paused.[2] John Capasso, the driver behind Mrs. Burdette on Emory Lane, testified that while waiting behind her he could not see down Muncaster Mill Road to the left, i.e., south, because of the raised ground along the side of the road.

While Mrs. Burdette's BMW was at the end of Emory Lane, a van driven by Roger Davis was next to her car, in the "right-turn only" lane on Emory Lane. Traffic on Muncaster Mill Road was heavy, and Mrs. Burdette waited in that position for approximately 20 seconds. Mr. Davis could see over the BMW toward the left (south). Intending to go right (north), Mr. Davis remained stationary because he could see a truck approaching from the south.

Mrs. Burdette, however, proceeded forward and began to turn left (south) onto Muncaster Mill Road. Mr. Davis testified that as Mrs. Burdette proceeded forward, her head was turned toward her right, looking past the front of his van.

Kathy Smith was driving south on Muncaster Mill Road. As she approached Emory Lane, she could see Mr. Davis's van. Ms. Smith saw a white BMW come out from behind the van "kind of quick" and start to turn left. Ms. Smith braked, because she was concerned that the BMW would turn in front of her and then slow down. Ms. Smith also looked farther to her left to see if another car would follow the BMW from Emory Lane.

Mr. Johnson was driving north on Muncaster Mill Road in the Ford pickup truck that Mr. Davis had seen approaching. Mr. Johnson testified that the last time he checked his speedometer, at the top of the slight rise down which he was proceeding toward Emory Lane, it read 35 miles per hour. Mr. Johnson was behind another car, which drove past Emory Lane. When Mr. Johnson first noticed the BMW, it was already moving "right into [his] lane." He estimated that he was approximately 100 to 150 feet from the BMW when it

---

2. Since this accident, a white line has been painted across the road at that point.

started to pull out. He initially steered his truck slightly to the left and then braked hard. The brakes locked, and the truck skidded 84–90 feet in a straight line before hitting the driver's door of the BMW.[3] The collision occurred primarily in the same lane in which Mr. Johnson had been traveling, but overlapped the edge of the lane toward the center of the road. Just prior to the collision, as his skidding truck approached the BMW, Mr. Johnson could see Mrs. Burdette looking to her right, away from him. The injuries that Mrs. Burdette suffered in the accident proved fatal.

## The Trial and Verdict

After four days of trial, the jury returned its verdict, answering "Yes" to each of the following questions: (1) "Was [the] defendant, John P. Johnson, negligent?"; (2) "Was the negligence of Defendant Johnson a cause of the plaintiffs' injuries?"; (3) "Was Constance Burdette negligent?"; and (4) "Was the negligence of Constance Burdette a cause of her injuries?" The court therefore entered judgment for appellees.

## Questions Presented

Appellants present four questions for our review:

1. Did the trial court commit reversible error in denying appellants' motion to strike a juror for cause ... ?

2. Did the trial court commit reversible error in refusing to permit plaintiffs' experts to testify as to their opinions concerning the cause of the collision ... ?

3. Did the trial court commit reversible error in failing to instruct the jury of the Boulevard Rule's limitations?

---

**3.** Only the rear brakes on the truck were anti-lock brakes; the front brakes locked up, but the rear did not lock completely. The range of measurement for the skid marks referred to the beginning of the skid marks (90 feet) and the point where all four tires began leaving skid marks (84 feet).

4. Did the trial court commit reversible error in failing to instruct the jury as to the doctrine of Last Clear Chance?

Discerning no error, we shall affirm.

## Discussion

### I.

After opening statements, the trial court heard testimony from John Capasso, the driver behind Mrs. Burdette. During the recess that followed, Juror 11–A asked to speak with the judge. The following exchange then occurred:

JUROR 11–A: My mother, in September of 1997, living in Prescott, Arizona, pulled out in front of a very busy street and was hit broadside. She survived. She is doing fine. She has no memory of why she did it. She is the most cautious person in the world. It just has an eerie similarity, what I am presented with. She had very clear vision. She was smacked broadside. She clearly was at fault, and I am finding it hard to sort of—I am finding myself feeling very awkward listening to this because I have the clear understanding my mother was at fault. She definitely could see. She made a mistake. I feel like I may be somewhat biased.

. . .

As soon as the circumstances arose I had a strong feeling that my mother was at fault in this case, and I think that is what my family has concluded. She pulled out. That is what the people said. It is a very busy street. It is a huge intersection. It is a highway. She did it every day. She is 76 years old. She is bright, alert.

She just pulled right out in front of the guy, and she is the most cautious person in the world. I just feel like it is hard for me to shake the sense that that is a very possible thing to do, to make that mistake, because my mother did it. THE COURT: Do you feel that your mother's experience . . . would affect your capacity to objectively evaluate this matter?

JUROR 11–A: I will do my best to objectively evaluate it. The reason I am bringing it to you is because it sounds too familiar.

THE COURT: I appreciate that.

JUROR 11–A: Before this happened the thought that my mother, who was so cautious about traffic, and every time we would go to visit them in Prescott she would say, "You make sure you look left, this is a dangerous highway." The fact that she would pull out in front of these people just astonishes me, and it still astonishes me that she would have made that mistake. She clearly made a mistake. It has an impact on me. It makes it seem very believable to me that somebody who is a good driver, who is a cautious driver, would completely—and so I am bringing that to your attention.

I will try to put everything aside and I will be happy to be a juror, but I wanted to let you know.

THE COURT: Well, we appreciate your bringing your thoughts and reflections to our attention. Why don't we do this, you come back tomorrow and you will participate unless I deem otherwise.

After the initial conference with Juror 11A, the court informed both parties that it would speak further with the juror at the close of all the evidence, so as to assess whether the juror still felt he could be impartial and base his decision on the law. The first conference with Juror 11A was the last trial event on the first day of trial. Appellant's counsel did not move to strike Juror 11A on that day, but did so at a "preliminary matters" bench conference on the next day, before the resumption of testimony. Near the end of the trial, after the jury had been instructed and closing arguments had been given, the court had another conference with the parties and Juror 11A. The court asked the juror if he felt "that the experience of a family member would affect your capacity to decide this case fairly and impartially based solely on the evidence and the applicable law," or if he felt "that it would

have such an impact that you couldn't do it?" The juror responded: "I feel like I would be fair."

Appellants' counsel then asked the juror if he had any "beliefs or biases" against drivers who "make turns from stop signs and get in collisions?" The juror answered:

I think what I said on Monday is what I still believe, which is that even careful people can make mistakes. That was my conclusion from my experience that I had with my mother. I found my mother to be a very careful and cautious driver.

This accident happened 2,000 miles from my purview, and I did not get out to Arizona to talk with them about it. She has no memory of the accident herself at all. It eradicated—she has no experience—memory at all of even being there.

So, there is nothing to be gained from talking to her. But in my own experience, my mother how she—this turn, always, and I would have my—the lesson that I took from it was the one I said Monday, which is that even careful people can sometimes make mistakes.

*I think that I have listened dutifully and carefully to the case, and can make the decision based on the merits of the case.* [Emphasis added.]

Appellants contend that the trial court, by denying their request to excuse Juror 11A, "generated reversible error on three levels—(a) the Juror should have been stricken for cause following his disclosure; (b) the Juror's bias should have been fully probed by the Trial Court; and (c) allowing the Juror to remain effectively denied the Appellants the full exercise of their peremptory challenge privilege."

■ On appeal, we will reverse a trial court's ruling on the composition of the jury only if the trial court abused its discretion. *Adams v. Owens–Illinois, Inc.,* 119 Md.App. 395, 402, 705 A.2d 58 (1998).

We defer to the trial judge's unique opportunity to observe the demeanor and suitability of potential jurors....
Under Maryland law, a juror *must* be discharged for cause

only when that juror cannot be impartial.... [A] juror *may* be struck for cause only 'where he or she displays a predisposition against innocence or guilt because of bias extrinsic to the evidence to be presented.' Although the cases cited are criminal, the same logic applies to civil cases; the linchpin in either is lack of bias and *a resolve to be fair and impartial*.

*Id.* at 402–403, 705 A.2d 58 (emphasis added; citing, inter alia, *Gorman v. State,* 67 Md.App. 398, 409, 507 A.2d 1160 (1986); *McCree v. State,* 33 Md.App. 82, 98, 363 A.2d 647 (1976)).

### (a)

■ Appellants argue that Juror 11A's knowledge of his mother's accident gave him an "obvious bias" against appellants, and that he should have been stricken for cause. Appellants mention that many other potential jurors who responded positively to the court's *voir dire* questions about automobile accidents were stricken for cause. Although Juror 11A did not respond affirmatively during *voir dire,* there was no indication that the juror had been evasive or secretive. The judge asked the jury pool if they or their immediate family members had been involved in litigation stemming from automobile accidents. During his conversations with the court during trial, Juror 11A never mentioned any litigation stemming from his mother's accident. It seems reasonable that, as the juror said, it was the testimony of the first witness that made the juror realize the similarities between Mrs. Burdette's accident and his mother's accident. He came forward immediately thereafter.

Appellants cite *Wyatt v. Johnson,* 103 Md.App. 250, 653 A.2d 496 (1995), for the premise that "[w]hen there is evidence of bias, the court may excuse a prospective juror even if that juror purports to be able to render a fair verdict." In this case, the juror's statements do not lead to a necessary or automatic inference that he was biased against any party; rather, as he reiterated several times, his mother's experience taught him that "even careful people can make mistakes."

This is not a statement that provides direct evidence of bias or prejudice.

■ *Wyatt* also indicates that a trial court *may* excuse a juror even if the juror purports to be able to render a fair and impartial verdict. The trial court is not required to excuse such a juror. The trial court had the discretionary ability to disregard the juror's promises of impartiality and dismiss the juror from the jury. In deciding to retain the juror, the trial court had the benefit of first-hand observation. The court was faced with a decision based largely on the credibility to be given to the juror's statements, and we will not say that the court abused its discretion in the choice that it made. *See Smith v. Pearre,* 96 Md.App. 376, 392, 625 A.2d 349, *cert. denied,* 332 Md. 454, 632 A.2d 151 (1993) (holding that trial court did not err in denying motion for new trial, despite failure by one juror to reveal during voir dire that he had a personal philosophy opposed to "people suing people").

### (b)

■ Appellants also contend that the trial court erred by not fully probing Juror 11A's potential bias. Appellants cite *Wilson v. Morris,* 317 Md. 284, 302, 563 A.2d 392 (1989), in which the Court of Appeals held that a trial court had an affirmative obligation to inquire again as to whether a juror could render a fair and impartial verdict after the juror, following opening statements and a trip by the jury to the scene of the accident, stated that "these cases are costing too much money." The failure of the trial court to conduct additional *voir dire* as to that juror's fairness and impartiality was reversible error. *Id.* at 304, 563 A.2d 392.

Here, the trial court twice questioned the juror about the juror's ability to render a fair and impartial verdict. The juror answered, "I will do my best to objectively evaluate it;" "I will try to put everything aside and I will be happy to be a juror, but I wanted to let you know;" and "I feel like I would be fair."

Appellants' counsel also questioned the juror, who answered, "I think that I have listened dutifully and carefully to the case, and can make the decision based on the merits of the case." Appellants could have questioned the juror more extensively, but did not do so. Appellants have not suggested any specific questions or topics that the court should have discussed with the juror.

We believe that the questioning that occurred was sufficient. The trial court had the opportunity to observe the juror and assess his credibility. The juror's responses permitted the trial court to determine that the juror would be able to participate in deliberations fairly and impartially.

## (c)

■ Appellants' third argument is that the trial court's decision to keep the juror on the jury "effectively denied the appellants the full exercise of their peremptory challenge privilege." At trial, after the juror came forward to report his mother's accident, appellants' counsel stated that, if the juror had made his revelation during *voir dire*, counsel would have used a peremptory challenge to remove that juror.

In jury trials,

a reasonable peremptory challenge right plays a vital role because it permits a party to eliminate a prospective juror with personal traits or predilections that, although not challengeable for cause, will, in the opinion of the litigant, impel that individual to decide the case on a basis other than the evidence presented.

*King v. State Roads Commission*, 284 Md.. 368, 370, 396 A.2d 267 (1979).

■ There is no showing in this case, as there was in *King*, of any deviation from the applicable rule as to peremptory challenges during the initial jury selection process. Litigants do not have the right to peremptory challenges sufficient to remove *every* potential or actual juror whom they do not desire to have on the jury. Appellants present no support for their contention that litigants who do not get "new" peremptory challenges during trial are somehow deprived of their

rights. Indeed, such a position would seem contrary to the recognition that neither the federal nor the Maryland constitution requires a grant of peremptory challenges. *King,* 284 Md. at 370, 396 A.2d 267.

This case concerns the retention or removal of a juror from a sitting jury during trial. Acknowledging that a trial judge's determination regarding the removal of a seated juror will not be reversed unless " 'arbitrary and abusive,' " we discern no such error. *State v. Cook,* 338 Md. 598, 612, 659 A.2d 1313 (1995) (quoting *James v. State,* 14 Md.App. 689, 699, 288 A.2d 644 (1972)); *see also Smith v. Pearre, supra.*

## II.

 Appellants argue that the trial court erred by refusing to allow appellants' expert witnesses to give their opinions of the cause of the accident. Appellants presented testimony from Montgomery County Police Officer Charles Simpson and from Harry Kriemelmeyer, Jr., who were both accepted as experts in the field of collision reconstruction. Officer Simpson and Mr. Kriemelmeyer testified, with very slight differences, to the following determinations about the accident: (1) the posted speed limit on Muncaster Mill Road, on which Mr. Johnson was traveling, was 40 miles per hour; (2) Mr. Johnson's Ford truck was traveling at approximately 64 miles per hour when Mrs. Burdette's BMW began moving forward; (3) the BMW began moving forward when the vehicles were about 333 feet apart; (4) Mr. Johnson probably first perceived the BMW when the truck was approximately 235–242 feet from the eventual point of impact; (5) Mr. Johnson, if he had a normal reaction time, spent the next 1.6 seconds, while the truck traveled 150 feet, processing the information that he had to react to avoid the BMW; (6) Mr. Johnson braked after that short period, leaving skid marks that began 90 feet from the point of impact and continued, in a straight line, to the point of impact; and (7) the truck was traveling at a minimum speed of 46 miles per hour when it collided with the BMW.[4]

---

4. All of these estimates comported closely with the estimates made by David Warshaw, appellees' expert reconstructionist. The experts also

Appellants' counsel then asked Officer Simpson: "Do you have an opinion that you can state to a reasonable degree of certainty, based on your education, your experience, and your investigation of this scene, as to what the cause of this collision was?" Appellees' counsel objected, and the following bench conference occurred:

[Appellants' counsel]: I am assuming the objection goes to -

THE COURT: The form of the question, the cause of the impact that is a factual determination by the jury. It is the way that the question is phrased ... more than anything else.

[Appellants' counsel]: I know it may go to the ultimate issue -

THE COURT: No, it is the ultimate issue.

[Appellants' counsel]: I think an expert is allowed to express his opinion, even if it subsumes within it, the ultimate issue, and it is evidence for the jury to consider.

[Appellees' counsel]: This goes beyond the facts, as well. I mean, it also is a legal issue as well. Your Honor will tell the jury, find the facts and apply the law, if there is one cause it is a combination of those issues, and that is within the province of the jury.

[Appellants' counsel]: Well, they are not bound—the jury is not bound to what he says, and Your Honor is going to instruct them on that, but he is and has been qualified as an expert. The experts are allowed to give their opinions and draw conclusions, and his function is to decide who was at fault in this collision.

THE COURT: His opinions are based on the location and speed of the vehicle. The causation is something a little bit more than that, Mr. Stein. And I think that it would be an invasion of the province of the jury for him to come to a factual conclusion as to what caused this accident.

---

estimated that, before the collision, the BMW traveled approximately 57–65 feet in approximately 3.4–3.7 seconds. The speed of the BMW immediately before the collision was 26 miles per hour.

He can render an opinion as to whether or not the impact would have occurred if the speed had been greater. That is different, that is a matter of computation. Causation brings into play a substantially greater number of factors, such as who was and who was not paying attention, and those kinds of things.

The ultimate issue being within the cognizance of an expert has very narrow applications. In (inaudible) cases, yes, and that kind of thing, but with respect to situations such as this, causation is solely within the province of the jury.

The trial court also sustained objections to appellants' proposal to ask Mr. Kriemelmeyer his "opinion with a reasonable degree of certainty in accident reconstruction as to whether or not it was reasonable or not for Mrs. Burdette to pull out," and his opinion "within a reasonable degree of certainty as an accident reconstructionist as to what caused this collision and who was the cause of the collision." [5]

Mr. Kriemelmeyer did testify, however, that if Mr. Johnson had perceived the BMW as soon as it began moving, when Mr. Johnson was still approximately 333 feet from the BMW, there would have been no collision. Mr. Kriemelmeyer also testified that there would have been no collision if Mr. Johnson had been driving at 55 miles per hour, just 9 miles less than his actual speed, and still 15 miles per hour above the speed limit.

Maryland Rule 5–702 provides:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a

---

5. The court similarly forbade Mr. Warshaw, appellees' expert, from testifying as to his opinions on the subject of "causation."

sufficient factual basis exists to support the expert testimony.

■ Maryland Rule 5–704(a) provides, in pertinent part, that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact." *See Sippio v. State,* 350 Md. 633, 654, 714 A.2d 864 (1998). An expert's opinion is admissible if it is relevant and will aid the trier of fact. *Cider Barrel Mobile Home Court v. Eader,* 287 Md. 571, 584, 414 A.2d 1246 (1980).

■ "[T]he admissibility of expert testimony is a matter largely within the discretion of the trial court and its action will seldom constitute a ground for reversal." *Myers v. Celotex Corp.,* 88 Md.App. 442, 460, 594 A.2d 1248 (1991), *cert. denied,* 325 Md. 249, 600 A.2d 418 (1992) (citations omitted). Appellants have the burden of showing that the trial court abused its discretion. *Mattingly v. Mattingly,* 92 Md.App. 248, 607 A.2d 575 (1992).

The questions posed to appellants' experts asked the experts to make a legal conclusion, not a factual one. It was apparent from the trial testimony that many factual circumstances contributed to the accident. The experts testified at length about these circumstances, including the excessive speed of Mr. Johnson's truck, Mr. Johnson's possible failure to immediately detect the movement of the BMW, and Mr. Johnson's failure to avoid the BMW.

The experts testified that if Mr. Johnson had been driving at any speed equal to or less than 55 miles per hour, the accident would not have happened. If appellants sought to have the experts identify Mr. Johnson's negligent driving as the "cause" of the accident, the testimony would have been both repetitive and inaccurate. They had already testified that the accident would not have happened without the speed, and the accident could still have been avoided if Mrs. Burdette had not pulled out in front of the truck. Also, Mr. Kriemelmeyer testified that Mrs. Burdette could have accelerated faster and cleared the path of the truck. Although there was

extensive testimony about the factual components of the accident, there was little disagreement among the experts concerning the crucial details of the accident. The jury was well-equipped to assess the facts and assign legal responsibility. The trial court did not abuse its discretion.

## III.

We recently have delineated Maryland's "Boulevard Law":

Under Maryland law, traffic rights-of-way are well established and certain roads or highways are favored. A motor vehicle on a favored road has the right-of-way against a vehicle on an intersecting unfavored road. The driver on the unfavored road must stop before entering the favored road and yield to the driver proceeding on that road, *provided that the favored driver is operating his vehicle lawfully.* Although he may not ignore obvious danger, the favored driver may assume that the unfavored driver will stop and yield the right-of-way.

When a motorist reaches a stop sign at the intersection of his road and another, and the street across which he wishes to proceed does not also have a stop sign, that motorist is traveling on an unfavored road and crossing a favored road. Maryland law clearly articulates his obligations toward drivers on the favored road:

[I]f the driver of a vehicle approaches a through highway, the driver shall:

(1) Stop at the entrance to the through highway; and

(2) Yield the right-of-way to any other vehicle approaching on the through highway.

Maryland Code (1977, 1999 Repl.Vol.), § 21–403(b) of the Transportation Article.

This rule has long been known as the "boulevard law." *Brendel v. Ellis,* 129 Md.App. 309, 313, 742 A.2d 1 (1999) (emphasis added; citation and footnote omitted).

 The trial court denied appellants' request that Mr. Johnson be found negligent as a matter of law. The court

instead gave the jury Maryland Pattern Jury Instruction ("MPJI") 18:2, without alteration. In pertinent part, the court instructed the jury:

Now, under Maryland [sic], certain roads or highways are given the status of favored highway. A motor vehicle on a favored highway is the favored vehicle, and the motor vehicle on the unfavored highway is the unfavored motor vehicle.

The driver of an unfavored motor vehicle must stop before entering upon a highway and yield the right of way to the favored motor vehicle, *provided the favored driver is operating lawfully.* The favored driver may assume that the unfavored driver will stop and yield the right of way. [Emphasis added.]

Appellants requested that the court modify the Boulevard Rule instruction "to tell the jury that they need to make the decision whether the boulevard law applies in terms of favored or unfavored, telling them that if they find that the driver on the thoroughfare was proceeding unlawfully, then neither driver carries any titles." This request was denied.

Appellants assert that, by refusing to modify the instructions, the trial court prevented the jury from finding that, even though Mr. Johnson was on the favored highway, he had lost his legal precedence over Mrs. Burdette's vehicle because he was speeding.

■ When reviewing a trial court's decision regarding a requested jury instruction, we examine "whether the requested instruction was a correct exposition of the law, whether that law was applicable in light of the evidence before the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given." *E.G. Rock, Inc. v. Danly,* 98 Md.App. 411, 421, 633 A.2d 485 (1993) (quoting *Wegad v. Howard Street Jewelers, Inc.,* 326 Md. 409, 414, 605 A.2d 123 (1992)).

■ The instructions given were sufficient explications of the law. The trial court instructed the jury that the unfa-

vored driver must yield the right-of-way "provided the favored driver is operating lawfully." This sufficiently implies that the Boulevard Rule may not apply if the driver on the favored road is proceeding unlawfully. In addition, the trial court gave the following instructions:

A violation of a statute which is a cause of the plaintiff's injuries or damages is evidence of negligence. I am going to read certain sections of the Transportation Article to you in connection with this matter.

Transportation Article, § [21]–801(a) reads as follows: 'A person may not drive a vehicle on highway at a speed that, with regard to the actual and potential dangers existing, is more than that which is reasonable and prudent under the conditions.' That was subsection (a).

Subsection (b) of the same article reads as follows: 'At all times, the driver of a vehicle on a highway shall control the speed of the vehicle as necessary to avoid colliding with any person or any vehicle or other conveyance that, in compliance with the legal requirements and the duty of all persons to use due care, is on or entering the highway.'

The substance of appellants' request was fairly covered.[6] Appellants, without opposition, clearly emphasized this point

---

**6.** Appellant sought an instruction that reads as follows:

You have heard that Constance Burdette was obligated to stop and yield the right-of-way to oncoming traffic, which has been characterized as the 'Boulevard Rule.' However, the term 'right-of-way' means the right of one vehicle to proceed in a **lawful** manner on a highway in preference to another vehicle. Therefore, the 'Boulevard Rule' does not apply if the 'favored driver' is proceeding in an unlawful manner. Examples of driving in an 'unlawful manner' include speeding, and/or failing to pay full time and attention to one's driving, failure to control speed, and/or failure to drive in the correct lane.

If you find that the Defendant was driving in an unlawful manner, then he is not entitled to any benefit over an unfavored driver that might be afforded by the 'Boulevard Rule.' [Emphasis in original.]

Although it may not be inappropriate to instruct the jury that it may consider speed, failure to control speed, and failure to pay full time and attention to one's driving in determining whether the favored driver was proceeding in an unlawful manner, it would only be appropriate if there is a sufficient showing that the unlawful conduct was a proximate cause of the accident. Unlawful conduct alone does not render the

during their closing argument to the jury.[7]

Indeed, the jury found that Mr. Johnson had been negligent in the operation of his vehicle. This indicates that the jury was aware that Mr. Johnson's position on the favored road did not immunize him from being found negligent. We find no error.

## IV.

Appellants also requested that the trial court give the jury MPJI 19:14, regarding last clear chance. That instruction reads:

A plaintiff who is contributorily negligent may nevertheless recover if the plaintiff is in a situation of helpless peril and *thereafter* the defendant had a *fresh opportunity of which defendant was aware* to avoid injury to the plaintiff and failed to do so. [Emphasis added.]

The trial court declined to give this instruction, and appellants now argue that this constituted reversible error.

 A court must give a jury instruction requested by a party if (1) the proposed instruction is supported by the facts of the case and (2) the theory of the case is not otherwise adequately covered by other instructions. *Mallard v. Earl,* 106 Md.App. 449, 469, 665 A.2d 287 (1995). In this case, the facts do not support the issuance of a last clear chance instruction.

---

Boulevard Rule inapplicable. *Dean v. Redmiles,* 280 Md. 137, 374 A.2d 329 (1977); *Mallard v. Earl,* 106 Md.App. 449, 665 A.2d 287 (1995). In this case, the jury found Mr. Johnson negligent.

7. Appellants' counsel stated during closing argument:

64 miles an hour in a 40–mile–per–hour zone is plenty fast, outrageously fast ... As he [Mr. Johnson] is driving down Muncaster Mill Road, the law says that he has the right of way as long as he is proceeding lawfully.... It does not give him the entitlement ... just to willy-nilly speed down that road.... Now, once he is proceeding unlawfully—unlawfully—and I suggest to you that the evidence is clear that he is proceeding unlawfully....

So, when he is not proceeding lawfully....

The doctrine of last clear chance originated in *Davies v. Mann,* 10 Mees. & W. 548, 152 Eng. Reprint. 588, 19 Eng. Rul. Cas. 190 (1942) (*see Ritter v. Portera,* 59 Md.App. 65, 70, 474 A.2d 556, *cert. denied,* 300 Md. 795, 481 A.2d 239 (1984)). *Davies* concerned a collision between a carriage and a donkey; the latter had been left by its owner in such a position as to block traffic on the road. The court found for the plaintiff, the owner of the donkey, because even though the animal had obstructed traffic "the defendant [carriage driver] was bound to go along the road at such a pace as would be likely to prevent mischief." *Davies,* 152 Eng. Reprint. 588. The theory behind the doctrine is that "if the defendant has the last clear opportunity to avoid the harm, the plaintiff's negligence is not a 'proximate cause' of the result." W.Prosser, Law of Torts (4 th ed.1971) § 66.

Maryland adopted the last clear chance doctrine in *Northern Central Ry. Co. v. State, use of Price,* 29 Md. 420, 96 Am. Dec. 545 (1868). There the Court of Appeals stated:

> The mere negligence or want of ordinary caution on the part of the deceased ... would not disentitle the plaintiff to recover [on behalf of the deceased], unless it were such that, but for such negligence or want of ordinary caution, the misfortune would not have happened; nor, if the defendant might, by the exercise of care on its part, have avoided the consequences of the neglect or carelessness of the deceased.

29 Md. at 436 (citing *Davies,* 10 M. & W. 545).

The Court has also explained that

> though the plaintiff may have been guilty of negligence, and that negligence may, in fact, have remotely contributed to the production of the accident, yet, if the defendant could ... by the exercise of reasonable care and diligence, in view of the circumstances of the case, have avoided the accident, the plaintiff's negligence, being the more remote cause, will not excuse the defendant.

*Kean v. Baltimore & Ohio R. Co.,* 61 Md. 154, 166–167 (1884). The Court subsequently stated, in *State, for use of Kolish v.*

*Wash., B. & A. Elec. R. Co.,* 149 Md. 443, 457, 131 A. 822 (1926), that

> [k]nowledge . . . on the part of the person causing the injury, superior to that of the injured person, is the ultimate basis of the doctrine, and *it follows that time is an essential element thereof, because the doctrine is not applicable unless the defendant discovered the plaintiff's peril in time, by the exercise of ordinary care, to have avoided the accident.*

In sum, then, the doctrine of last clear chance permits a contributorily negligent plaintiff to recover damages from a negligent defendant if each of the following elements is satisfied: (i) the defendant is negligent; (ii) the plaintiff is contributorily negligent; and (iii) the plaintiff makes "a showing of something new or sequential, which affords the defendant a fresh opportunity (of which he fails to avail himself) to avert the consequences of his original negligence." *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 638, 495 A.2d 838 (1985) (citations omitted). For the doctrine to apply, the acts of the respective parties must be sequential and not concurrent. *Roberts v. Fairchild,* 14 Md.App. 612, 618–619, 287 A.2d 778 (1972), *cert. denied,* 278 Md. 722 (1976); *Oddis v. Greene,* 11 Md.App. 153, 157, 273 A.2d 232 (1971).

 Appellants argue that a last clear chance instruction was warranted by the possibility that the jury could find that Mr. Johnson's inattentiveness on the morning of the accident constituted a failure to avert the consequences of his "original negligence", i.e., his excessive speed. Thus, Mr. Johnson allegedly squandered a "fresh opportunity" that was sequential to his first negligent act.

The testimony at trial, however, indicated that Mr. Johnson's negligence was simultaneous to Mrs. Burdette's contributory negligence. The testimony of the eyewitnesses and the experts indicated that Mr. Johnson was driving north on Muncaster Mill Road, at a high rate of speed, when Mrs. Burdette pulled out in front of him. Mrs. Burdette was allegedly looking to her right, away from Mr. Johnson. Mr.

Johnson's speed was excessive, and he may have been inattentive. Her inattentiveness, however, put her in his path.

There was no sequence of events that afforded Mr. Johnson a "fresh opportunity" to avoid the accident. According to the experts, Mr. Johnson was driving 64 miles per hour, or 93.8 feet per second, when he first saw the BMW. All three experts estimated that it would probably take him 1.5 or 1.6 seconds to react. When he did react, he turned the truck slightly to the left, and then slammed on his brakes.

*Creighton v. Ruark*, 230 Md. 145, 186 A.2d 208 (1962), concerned a collision that occurred when the plaintiff, whose vehicle was parked on the west side of a north-south road, pulled out onto the road, heading south, and then attempted to turn left into his driveway. The rear right side of his vehicle was struck by the defendant's vehicle, which had been traveling north at a speed approaching 70 miles per hour. The speed limit was 30 miles per hour. The road south of the accident was visible for a quarter of a mile, but the plaintiff testified he never saw the defendant. The defendant testified that the plaintiff made the turn when they were only two car lengths apart. The defendant tried to slow down as soon as he saw the other vehicle turning. Based on those facts, the trial court issued a last clear chance instruction.

The Court of Appeals reversed, holding that there was no factual basis to invoke the doctrine of last clear chance. "The doctrine only applies in a case where both parties are negligent but there is a sequential act of negligence on the part of one [party]." *Id.* at 151, 186 A.2d 208. The defendant's negligent act of driving 70 miles per hour was concurrent with the plaintiff's negligent act of turning in front of the defendant. After the plaintiff began turning, "[t]here is no evidence that the [defendant] failed to 'utilize with reasonable care and competence his *then existing* ability to avoid harming the plaintiff.'" *Id.* (emphasis in original). The evidence showed that the defendant "did the best he could to slow down when he realized that the other car was pulling across in front of him. There is no evidence that, under the conditions then

existing, he had an opportunity to avoid the collision." *Id.* at 151–52, 186 A.2d 208.

In the present case, Mr. Johnson's negligent speeding and possible inattentiveness was concurrent with Mrs. Burdette's negligent inattentiveness. After she pulled out in front of him, and he first realized that a collision was possible, there is no evidence of a fresh opportunity to avoid the collision.

Appellants emphasize that there may have been a brief period after the BMW started rolling forward, but before Mr. Johnson perceived that the BMW was coming into his path. The experts testified that, assuming Mr. Johnson had a normal response time of 1.6 seconds from perceiving the BMW as a threat to taking physical action, he was 242 feet from the BMW when he perceived the car as a threat (1.6 seconds later, he was 84–90 feet from the BMW when he braked). Mr. Kriemelmeyer, however, estimated that the truck was 333 feet from the BMW when the latter began moving. Assuming Mr. Johnson's response time was normal, the truck had traveled approximately 91 feet, from 333 to 242 feet from the collision site, before Mr. Johnson perceived the BMW.

Those 91 feet would have only taken the truck 0.9 seconds,[8] however, and during that brief period the BMW was moving only slightly, as it started from rest and began forward. Mr. Johnson testified that he was focused on the road ahead of him, and did not see the BMW until he perceived that it was coming into his path.

Appellants contend that, had Mr. Johnson been more attentive while driving, he would have seen Mrs. Burdette at the beginning of this 0.9 second period, thus moving his reaction time forward and giving him more space in which to brake. This may or may not be true. Mr. Johnson's testimony indicates that he did not perceive the BMW as a threat until

---

8. In their brief, appellants assert that Mr. Kriemelmeyer described this period as being 1.6 seconds. It appears that they have confused the 1.6 seconds of estimated reaction time with the 0.9 seconds during which, according to Mr. Kriemelmeyer's hypothesis, the BMW was moving but Mr. Johnson did not perceive it.

he saw it coming into his lane. Thus, the BMW's initial movement forward might have been seen even by an attentive driver as simply the movement of a vehicle edging forward in preparation for an entry to the road.

Moreover, for the doctrine of last clear chance to apply, the defendant must be *aware* that he has a fresh opportunity to avoid injury to the plaintiff. There is no evidence of such an awareness. Both before, during, and after the 0.9 second period, Mr. Johnson was driving at approximately 64 miles per hour. As we have noted, he could have perceived the BMW moving but not perceived that it was a threat. In any event, we do not believe it is proper to view the 0.9 second crossover period as an event separate from the events constituting the collision.

In *Ritter v. Portera*, 59 Md.App. 65, 474 A.2d 556, a teenage driver stopped alongside three teenage girls, one of whom was his sister and one of whom was the plaintiff, and asked them if they wanted a ride. In response, the three girls started to climb onto the hood of the car; the driver's house was just two houses away, and the girls assumed that was his destination. As the girls climbed onto the car, the driver "gunned" the engine, accelerating rapidly and dragging the plaintiff for 25 feet. Although we agreed with the trial court that the plaintiff had been contributorily negligent by climbing onto the car, we reversed the trial court's decision to enter judgment in favor of the driver. We held that the driver had the last clear chance, after the girls had started to climb onto the car, to refuse to move the car until the girls climbed off. *Id.*, 59 Md.App. at 72, 474 A.2d 556.

Mr. Johnson did not have the same opportunity for reflection. Whereas the car in *Ritter* was stationary when the driver made the decision to proceed forward rapidly, Mr. Johnson was already traveling at approximately 64 miles per hour when the emergency arose. The jury clearly found Mr. Johnson negligent, but the evidence does not reflect a fresh opportunity to avoid the accident.

JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.