UNITED RAILWAYS & ELECTRIC COMPANY *v.*
SHERWOOD BROTHERS, INCORPORATED.
[No. 21, October Term, 1931.]

*Decided December 4th, 1931*

The cause was argued before PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Wallis Giffen,* with whom was *Philip S. Ball* on the brief, for the appellant.

*Leonard Weinberg* and *Howard A. Sweelen,* for the appellee.

ADKINS, J., delivered the opinion of the Court.

This appeal is from a judgment in favor of plaintiff on a verdict for damages to a gasoline truck resulting from a collision between the truck and a car of the defendant. The accident happened in the daytime, at a private crossing in the country on the York Road in Baltimore County, at the private entrance into the Towson Nurseries, south of Towson.

According to his testimony, the driver of the truck was familiar with this crossing and considered it dangerous. He was going north up the York Road, and when about fifty to seventy-five feet south of the entrance he looked around to see whether a car was coming and he did not see any; all the street car tracks at that time were on the right side of the York Road going north, and the roadway for vehicles on the left side, "so that you had to cross both car tracks to get into the Towson Nurseries." When he looked back at the place mentioned, he could see as far as the crest of the hill, about three ordinary squares, or nine hundred feet. "When I seen it wasn't any car coming I started on down, and the truck that I had had an awful long wheel base, and in order to make this turn * * * I would have to make a dive to the left side of the road, and there was right smart traffic on the road that morning; when I say I had to go to the left side of

the road in order to do that I mean I would have to pull out to the left side of York Road to make the turn into the driveway, and I didn't do that because there was a lot of south bound traffic. So I took the most of the left of the road as I dared to do, and as I gets down almost to make the turn, I stopped. I figured I might make the turn and I might not, and when I stopped, the other fellow coming south stopped, and when all of the traffic had practically stopped, I starts on in, and I looked around to see whether or not the car was coming and I starts over the track. There was no car coming either way at that time. Well, after I got in I couldn't make the turn. The front wheels got to the last track on the east side, the north bound track. * * * It is an awful narrow driveway, and I stopped still, and I looked around in the back, and two or three machines were behind me, and the man that stopped before I turned in was still standing there, and I beckoned for the man behind me to come down, and two or three machines came by, and the man coming south on the York Road beckoned for me to go on in, and when he did, I opened my brake—just throwed it back a foot or two to throw my wheels around, and I started in over the track. After my front wheels got over the track and in the Towson Nurseries driveway I looked up like this (indicating) and I see the car, and when I seen the car that is all I can remember. It was mighty close then. I'll say from five to ten feet, I'd say, it looked to me, right on top of me. After I had first started in over the tracks my truck was not at any time back off of those tracks altogether, in other words, part of my truck was always on part of those tracks."

Plaintiff's counsel then asked: "Q. They weren't on the northbound tracks, but they were on the southbound tracks? A. I never got off of the northbound tracks. Q. Your front was still on the northbound track? A. Yes."

The witness then proceeded: "And then after I backed back this foot or two to be able to swing my wheel and started up again, after I had turned my wheel and started up this second time the front of the truck was right across the one northbound track, the rail, I mean, the one on the

west side, the front of the truck was across the west rail of the northbound track. When I was struck the front wheels were in the Towson Nurseries driveway." The witness was struck by a car of the defendant on the northbound track. He testified that as you come over the crest of the hill southwardly (he evidently meant northwardly) you run steadily downgrade past Terracedale Road, which is a private entrance south of the private crossing on which the accident occurred. That Hillsdale Road is a public road just north of the private entrance to the nurseries, and this public road also leads to the nurseries. "The road I was trying to take into the Towson Nurseries is just a narrow crossing and a private road that runs into the nurseries grounds." This witness further testified that he looked twice for approaching cars, once at the distance of fifty to seventy-five feet from the crossing, and again just before he got on any of the tracks, before he started to go over. "At that time I told you I changed gears, I looked to see if the car was coming. * * * The next time I looked up for the street car was when I was across the tracks. I mean across the northbound track, and then I saw the car about five or ten feet away from me." He was moving at about five miles an hour. The rails were T-rails and constructed for rapid travel. The uncontradicted testimony is that the car was moving at about twenty-five miles an hour.

Edward Cranston, another witness for the plaintiff, testified that he had just come out and was standing in front of a house along the driveway about fifty feet east from the tracks. When he first saw the truck the whole truck was on both tracks, headed into the nurseries. "At that time I could see to my left down York Road about one hundred and fifty feet. (He afterwards explained that distance was estimated from the house, and that the distance from the crossing was about a hundred feet.) There was nothing coming north on the street car tracks within my line of vision at that time. I walked off the porch and I seen the truck crossing the car tracks, but he couldn't make the turn; and I was standing and watching him; he had to back up a couple feet

to make his turn, and just as he backed up a couple feet to make his turn, and just as he backed up and started off again, just as he started off, I seen the street car coming from behind the house that was in my view; then the street car was one hundred and fifty feet away (as explained above one hundred feet from the crossing), when I saw the street car one hundred and fifty feet (one hundred feet from the crossing), the front wheels of the truck were about the center of the northbound track. * * * Then the street car kept coming, making no effort to stop, and hit the truck right behind the cab, pushed it eight or ten feet, and then it turned over." The witness afterwards explained that he did not mean to say that he could see whether or not the motorman was making an effort. "What I really mean to say is, as far as I could observe, there wasn't any change in the speed of the car. I never saw the motorman. I only saw the street car momentarily, before the collision occurred."

The motorman testified that as he came down the grade he did not turn the power on, he was coasting and going just the average speed, twenty-five miles an hour. "That is T-rail there, raised rails on cross ties, with stone ballast." That the private driveway where the accident happened is about seventy-five or eighty feet north of Terracedale; that the length of his car is forty-two feet; that when he first saw the truck the car was south of Terracedale, about three hundred feet. The truck was then on the York Road going north ahead of the car; that when the car got to Terracedale the truck was turning in the private driveway; that he then applied his brakes, rang the bell, and threw the car into emergency; that the truck during that time was coming across the tracks; that he did not see the truck get on the track and then fall back and start forward again. "My testimony is that the truck came up on the track—the front wheels were on the southbound track and I was coming down this hill near Terracedale, and I slowed up the speed of my car and was ringing the bell and the truck just came to about a stop, and when I seen him I had no idea he was coming across the street and I left the air off, and just at that

time he came right over, then I pulled sand and throwed my car into emergency and reversed it, and just about that time the crash came. The car was about eighty feet from the crossing when I had to pull sand. That was just as I was crossing Terracedale, just at Terracedale. * * * When I first saw this truck pause for a moment and then start up, and applied my emergency and pulled the sand lever, I wasn't able to bring my car to a stop before hitting the truck because I couldn't stop it before. I was too close to it."

The defendant asked for a directed verdict: A. Because there was no evidence legally sufficient to entitle plaintiff to recover. B. Because of contributory negligence. C. Because of concurrent negligence. D. Because the last negligent act and proximate cause of the accident was the negligence of the driver of the truck. In our opinion either defendant's A or B prayer should have been granted.

If there was any evidence of primary negligence on the part of the defendant, in our opinion it is a clear case of contributory negligence on the part of the plaintiff. In the first place, with such a large and unwieldy truck the driver should not have attempted to cross the tracks at a point which he knew to be dangerous in order to get into a narrow private entrance, when there was a public road a few feet further on with which he was familiar, and by which the entrance to the nurseries was both convenient and safe. At any rate, at such a place and with such a truck, almost as large as a freight car, he was charged with the exercise of even more than ordinary care; for negligence on his part might have resulted in injury or death to passengers in the cars. But we do not rest our decision on this consideration. He did not use what would have been even ordinary care with *any* kind of a vehicle. It is inconceivable that, if he had looked, as he said he did, just before driving on the southbound track, he would not have seen the approaching car. According to his own testimony, he had a clear view for nine hundred feet, and the car moving at the rate of twenty-five miles an hour, must have been somewhere within that distance when he started to cross the tracks. As was said in

*Baltimore Traction Co. v. Helms,* 84 Md. 515, 36 A. 119, 121, and has been said many times since: "If a witness who can see testifies that he looked, and did not see an object which, if he had looked, he must have seen, such testimony is unworthy of consideration."

But it was not enough even if he did look at that point. He should have continued to look until he reached the last track, and this he did not do. Had he done so he must have seen the car in time to have avoided the danger. *Gerlach v. Electric Ry. Co.,* 142 Md. 638, 121 A. 577; *Annapolis, W. & B. R. Co. v. State, use of Hickox,* 104 Md. 665, 65 A. 434; *Meidling v. United Rwys. & Elec. Co.,* 97 Md. 76, 54 A. 612; *McNab v . United Rwys. & Elec. Co.,* 94 Md. 719, 51 A. 421, 423. His negligence was so gross as to preclude the right of plaintiff to recover.

It is earnestly contended, however, that the learned trial court properly refused to withdraw the case from the jury because, even if plaintiff was negligent, defendant's servant could have avoided the consequence of plaintiff's negligence by the exercise of ordinary care after he discovered or should have discovered the perilous position of the truck. In other words, appellee invokes the last clear chance doctrine. But that doctrine has no application here. Assuming that the front wheels of the truck were over the west rail of the northbound track when the witness Cranston saw the car at a distance estimated by him to be a hundred feet from the crossing, or at such time as the driver of the truck said the front wheels were in that position, there is not the faintest gleam of evidence to show that the motorman could then have stopped the car or checked its speed in time to avoid the collision. Nor is there any evidence that at that time the chauffeur could not have extricated himself from his position of peril by the exercise of ordinary care. All he had to do was to back his truck two or three feet.

As was said in the *McNab case, supra,* "the doctrine is only applicable when the company's negligence in not avoiding the consequences of the plaintiff's negligence is the *last*

negligent act. It can never be invoked when the plaintiff's own act is the *final* negligent act."

And the chauffeur's own act *was* the last negligent act if his was the last opportunity to avoid the injury by the exercise of ordinary care. According to his own testimony, he could have backed the truck off the track if he had exercised due care in looking for the approaching car. The car had to cover eighty or one hundred feet, in which distance, the uncontradicted testimony is, it could not be stopped; while it was necessary to back the truck only two or three feet in order to avoid injury.

But even if there were evidence that the motorman could have stopped the car after he saw or should have seen the truck in a position of peril, still, if the chauffeur could then have escaped by the exercise of ordinary care on his part, the doctrine would not apply. It would then be a case of concurrent negligence. And that takes the case out of the operation of the doctrine. *Doble v. United Rwys. & Elec. Co.,* 155 Md. 343, 142 A. 106; *Campbell & Sons v. United Rwys. & Elec. Co.,* 160 Md. 647, 154 A. 552. Of course, this does not apply to one who *actually* realizes that another is oblivious to impending danger and fails to do what he could to save him.

> *Judgment reversed without a new trial, with costs to appellant.*