## I.O.A. LEASING CORPORATION *v.* MERLE THOMAS CORPORATION

[No. 128, September Term, 1970.]

*Decided January 5, 1971.*

244

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and SMITH, JJ.

*Harold Smith* for appellant.

*Benton L. Becker* for appellee.

FINAN, J., delivered the opinion of the Court.

We must decide in this case whether or not the trial judge was correct in his denial of the appellant's motion for judgment n.o.v. or, in the alternative, for a new trial. The facts are complicated and lengthy, involving, as they do, a computer leasing contract, so for the benefit of those with little perseverance we state at the outset that we affirm the lower court. The facts which the jury had to consider were as follows:

On April 13, 1967, the appellant (I.O.A.), a computer leasing company, entered into a contract with the appellee Merle Thomas Corporation (M.T.C.), a company in

the business of renting time on its computers to individual customers. Under the terms of the contract, I.O.A. was to lease to M.T.C. an IBM 1401 computer system consisting of a central processing unit and eight auxiliary pieces of equipment. There were no warranties as to the condition of the computer in the contract, and no statement that time was to be of the essence. The contract did state that the monthly rental would be 20% less than the price charged by IBM for the same system, and that M.T.C. would not be required to pay any overtime charges for use of the system. Normal IBM maintenance was to be paid by I.O.A., and the overtime or "second shift" maintenance charges were to be paid by M.T.C. I.O.A. was to pay the shipping charges for delivery of the system to M.T.C. and also the charges for having the system installed; however, the contract was silent as to which party was actually responsible for installation.

The total monthly rental for the system was $6,448.00, of that sum $3,088.00 was payment for the central processing unit, and $3,360.00 for the eight auxiliary pieces of equipment. Rental payments were to commence on May 15, 1967, "subject to the date of delivery." I.O.A. had purchased the 1401 central processing unit from a bank in Worcester, Massachusetts for $72,000.00 and undertook to make the delivery on May 15, 1967.

There was a delay caused by a trucking strike, and the central processing unit was not delivered to M.T.C. until May 30, 1967. Notwithstanding the fact that the system in question was under an IBM maintenance contract, the physical condition of the central processing unit which was delivered left much to be desired, and was described by various witnesses as "filthy," "dirty," "greasy," "grimy," "a mess," and "full of dents." In spite of their reservations about the condition of the unit and its ability to perform, the individuals responsible at M.T.C. accepted delivery of it because they apparently had no other available source from which to get this particular computer system.

It is not clear from the contract who was responsible

for getting IBM to install the system, and it is not clear from the record who actually made the initial attempts at having the machine installed in early June of 1967, but the attempts were unsuccessful. A meeting between the parties and their attorneys was held in New York City on June 19, 1967, in an effort to resolve the problems which had arisen. What is clear from the record is that after this meeting, I.O.A. was the party which in fact was attempting to get the unit installed with the same unimpressive results as were produced by the earlier efforts. In any event, M.T.C. allocated time for installation of the unit on four or five occasions between early June, 1967 and June 27, 1967, and nobody ever appeared to do the work.[1] This, coupled with the appearance of the unit, and late and partial delivery, was causing great annoyance to Mr. Merle Thomas (the President of M.T.C.). On June 27, 1967, I.O.A. telephoned and asked M.T.C. to allocate time on the next day (June 28th) instead of June 29th as had previously been planned. This was apparently the proverbial straw which broke, in this case, the appellee's back. Because of the inconvenience which would result to its customers and the short time element involved, M.T.C. decided that it could not make such a change and terminated the contract, thereby leaving I.O.A. with one used data processing unit worth approximately $72,000.00 which appeared to be everybody's "ugly duckling." [2] Thus began the parties' journey to this Court.

On September 15, 1967, M.T.C. filed suit in the Circuit Court for Montgomery County. After preliminary

---

1. M.T.C. was replacing a 1401 computer system which they were then leasing from IBM with the 1401 system which they were getting at a reduced cost from I.O.A. It is not clear from the record exactly what was involved in putting the system into operation, but there was testimony that the installation would have to be done by IBM personnel, that it would take at least four hours to get the computer "connected," and apparently longer than that to "get it to run." Because of the wiring system in M.T.C.'s office it could only operate one 1401 computer system at a time, so that each time an installation was scheduled, M.T.C. allocated 8 hours for the installation and scheduled no customers on their 1401 system for that period.

2. M.T.C.'s attorney testified that on June 27, 1967, he wrote I.O.A.'s president that M.T.C. considered "the contract breached and to come get his equipment."

motions were disposed of I.O.A. filed an answer and counterclaim on June 19, 1968. On December 8, 1969, a jury trial was commenced and at the close of all the evidence I.O.A. moved for a directed verdict. Its motion was denied and the jury awarded M.T.C. a verdict of $21,561.00 on December 9, 1969. On December 12, 1969, the appellant filed a motion for judgment n.o.v. or for a new trial in the alternative. This motion was denied at a hearing on January 16, 1970, and a remittitur of the verdict to an amount of $17,961.55 was granted and agreed to by the appellee. From a denial of its motion for judgment n.o.v. or for a new trial, I.O.A. brings this appeal.

Appellant's primary contention is that as a matter of law, M.T.C. could not, with impunity, cancel the contract without ever having had the computer installed to see whether or not it would work, and that any evidence as to the delivery or condition of the computer was not relevant. Appellant argues that there was an implied condition precedent which required M.T.C. to "plug in" or "hook up" the unit. In appellant's view of the case, the issue is "whether or not the machine would perform," and it compares the case at bar to an automobile lease, and hypothesizes a situation wherein the lessee receives a dirty and dented automobile and rescinds the rental contract without ever having tried to start the car. The analogy is appealing in its simplicity, but not quite accurate. Had the lessee of the automobile in the hypothetical situation received a car which was not only dirty and dented, but also without gasoline, wheels, doors, or windows, the analogy would have been more complete. In such a case it could hardly be said that, as a matter of law, he would have to turn the key in the ignition before he could consider the contract to be at an end.

Appellant's argument not only assumes that M.T.C. was responsible for the installation of the system (which issue was hotly contested throughout the trial and the resolution of which was left for the determination of the jury), but also ignores the fact that there must first have been a delivery "under the terms of the contract," as noted by Judge Miller in his instructions to the jury.

Judge Miller elaborated on that phrase by instructing that
the appellant had to show that it "delivered the goods
that were intended to be delivered by the parties when
they entered into the contract or lease agreement," and
that the jury might consider, relative to the question of
delivery, the reasonableness of the time of the delivery,
and the "condition of the equipment." He continued that
if the jury found that there was not a complete delivery,
they should then apply the doctrine of substantial per-
formance, unless they were of the opinion that there was
a "material failure to deliver," in which case the verdict
would be for the plaintiff (appellee). The record extract
fails to reveal that the appellant took any exceptions to
the trial judge's instructions to the jury, and a reading
of those instructions shows that Judge Miller squarely
left to the jury the questions of whether there had been
a delivery under the terms of the contract or substantial
performance of the contract.

If there was a failure to deliver all items of equipment
which were bargained for in the contract within a reason-
able time, the jury might well have concluded that such
a failure to deliver within a reasonable time was a ma-
terial breach of the contract. Where the contract does not
make time of the essence, we have frequently stated that
a reasonable time under the circumstances of the case
should prevail. *Kasten Co. v. Maple Ridge Co.*, 245 Md.
373, 377-379, 226 A. 2d 341 (1967) ; *Velte v. McBride*, 208
Md. 434, 441, 118 A. 2d 640 (1955) ; *Evergreen Amuse-
ment Corp. v. Milstead*, 206 Md. 610, 617, 112 A. 2d 901
(1955) ; *Hagan v. Dundore*, 185 Md. 86, 95, 43 A. 2d 181
(1945) ; *North v. Mallory*, 94 Md. 305, 318, 51 A. 89
(1902).

In considering this appeal, it must be remembered that
I.O.A. is contesting a denial of its motion for judgment
n.o.v. or a new trial. Maryland Rules 563a 1 and 563a 3.
This Court has consistently followed the rule that in re-
viewing a defendant's [appellant's] motion for directed
verdict the evidence and all reasonable inferences to be
taken from that evidence are reviewed in the light most

favorable to the plaintiff [appellee]. *Trusty v. Wooden,* 251 Md. 294, 297, 247 A. 2d 382 (1968) ; *Thompson v. Terry,* 245 Md. 480, 489, 226 A. 2d 540 (1967) ; and with regard to the motion for a new trial we have repeatedly stated that the granting or denial of such a motion is a matter within the sound discretion of the trial court. *Kirkpatrick v. Zimmerman,* 257 Md. 215, 217, 262 A. 2d 531 (1970).

There was testimony from which the jury could have found that the delivery by I.O.A. consisted of delivery of the central processing unit only and that this segment, without the eight auxiliary pieces, was of little or no use to the appellee. The lease agreement itself indicates that the rental price for the central processing unit was only 47% of the total monthly rental for all the equipment; such a discrepancy between the rental for the delivered equipment and the total rental could have been considered as relevant to the question of whether or not there had been a material breach of contract. Cf. *Evergreen Amusement Corp. v. Milstead, supra,* pg. 622, wherein the Court found the breach was not material, noting that the work in dispute amounted to only $1000 of a $13,000 contract.

There was also the testimony of I.O.A.'s president to the effect that, not only had I.O.A. been unable to deliver the eight auxiliary pieces, but that by the date of the cancellation of the contract (some six weeks after the originally contemplated delivery date) these pieces had not yet been purchased by I.O.A. so that delivery of them would not have been possible.

Appellant contends that M.T.C. had the responsibility under the contract to have the unit installed, but the contract was silent on this point. While it is true that Stuart Rubenstein, the president of I.O.A., testified that the general practice in the industry was for the lessee (M.T.C.) to have the unit installed, there was evidence that was somewhat inconsistent with that testimony, namely, that I.O.A. was going to pay for the installation. Additionally, there was introduced into evidence a letter dated May 3, 1970, from one Mr. Brooks of IBM to Stuart Ru-

benstein, President of I.O.A., acknowledging Rubenstein's letter of April 24, 1967, concerning the change in location of the 1401 computer system from the bank in Worcester, Massachusetts, to M.T.C.'s office in Kensington, Maryland. The letter continued that Rubenstein's letter had been forwarded to a Mr. McCann of IBM, "who will be responsible for the installation and service of this equipment." It could logically be inferred by the jury that Rubenstein's original letter of April 24th to IBM had some reference in it to the installation of the equipment, from which it could reasonably be deduced that I.O.A. had early in the game recognized an obligation on its part to have the unit installed. Lastly, there was evidence that after the meeting of June 19th in New York City, which had been arranged to settle the problems that had arisen under the contract, it was I.O.A. who was in fact making the arrangements to have the computer installed.

The questions of whether or not there was a delivery under the contract within a reasonable time, whether M.T.C. or I.O.A. was required to install the computer system, and whether or not, if there was a failure to deliver or install, that failure was substantial enough to allow M.T.C. to justify cancelling the contract, are peculiarly within the province of the jury. It would appear that the jury, after hearing and evaluating all the evidence, decided that the partial delivery of only one of nine pieces called for in the contract was not sufficient, and that the failure to deliver (and possibly to install) was enough of a breach of contract by I.O.A. to warrant termination by M.T.C. There certainly was sufficient evidence in the record from which the jury could have reasonably reached such conclusions. In our opinion it would have been error for Judge Miller to have disturbed the jury's verdict on the question of I.O.A.'s liability.

The testimony on damages revealed that the dollar cost difference between the IBM computer which the appellee was forced to retain for a seven months period, as compared with the I.O.A. computer was $21,561.00, which was the amount of the verdict rendered by the jury. The

lower court, however, believed that an adjustment of this figure was proper and ordered a new trial unless the appellee remitted the amount of the judgment in excess of $17,961.00 to which the appellee agreed. On the other hand, I.O.A. contended, that since the IBM computer retained by the appellee was more valuable, being faster, and having the capacity to generate $300 a month more earnings per tape (there were four tapes) than its computer, that the remittitur should have been to the amount of $13,161.00. We note, however, that there was testimony to the effect that the slower type machine, such as I.O.A. had agreed to furnish, was in short supply and that there was little that the appellee could do, other than to continue to use the IBM equipment then on the premises. We find no evidence in the record which would clearly support an argument that the appellee had the opportunity to mitigate damages, or could reasonably have done so, and failed to do so. *M. & R. Builders v. Michael*, 215 Md. 340, 354, 356, 138 A. 2d 350 (1958). Therefore, we find no error in the judgment as modified by the remittitur of the lower court.

*Judgment affirmed with costs.*