846 A.2d 50

**Preston CARTER**

v.

**SENATE MASONRY, INCORPORATED.**

**No. 334 Sept. Term, 2002.**

Court of Special Appeals of Maryland.

April 6, 2004.

Thomas E. Walker (McNamee, Hosea, Jernigan, Kim, Greenan & Walker, P.A., on the brief), Greenbelt, for Appellant.

Susan S. Muller (Paul Bensch, on the brief), Owings Mills, for Appellee.

Panel: MURPHY, C.J., DAVIS, HOLLANDER, JAMES R. EYLER, SONNER, KENNEY, DEBORAH S. EYLER, ADKINS, KRAUSER, BARBERA and SHARER, JJ.

SONNER, Judge.

This appeal concerns the legal doctrine of "last clear chance." Preston Carter accused an employee of Senate Masonry, Incorporated ("Senate") of negligently harming him at a construction site. A jury in the Circuit Court for Prince George's County accepted that accusation, but found Carter negligent as well. Nonetheless, it awarded Carter damages, with the apparent belief that the Senate employee had the last clear chance to avoid the injury, and his failure to do so warranted compensation for Carter. The trial court disagreed and granted Senate's post-trial motion for judgment notwithstanding the jury's verdict ("JNOV"). We disagree with the trial court and reinstate the jury's verdict.

## I.

It is critical to note at the outset that we present the facts in the light most favorable to Preston Carter, because he prevailed at trial and lost below on the JNOV. *See Wholey v. Sears Roebuck,* 370 Md. 38, 46, 803 A.2d 482 (2002). That also means that, in our analysis, we will reverse the grant of the JNOV if there is any evidence from which the jury could have reached the conclusion that it reached. *Houston v. Safeway Stores, Inc.,* 346 Md. 503, 521, 697 A.2d 851 (1997). The circuit court must respect these same guiding principles when

it receives a motion for JNOV. *See I.O.A. Leasing Corp. v. Merle Thomas Corp.*, 260 Md. 243, 248–50, 272 A.2d 1 (1971).

The evidence at this trial consisted of three primary witnesses: two fact witnesses presented by Carter and an expert witness presented by Senate. Carter is a commercial plumber with twenty years' experience. He testified that on August 15, 1997, he was working in Columbia, Maryland, at the construction site for a new Safeway supermarket. While installing some rudimentary plumbing, Carter walked over to the nearby scaffolding to locate certain pipe fittings. He noticed a forklift that was situated about a hundred feet away from him. The forklift operator delivered a cube of cinder block to the scaffold.

As he knelt on the ground searching for the parts, he perceived the forklift move in behind him, coming as close as six to ten feet from him, and then stop in front of the scaffolding. The operator of the forklift then maneuvered the machine to place a pan of mortar upon the cube of cinder blocks that had just been delivered to the scaffold. His action caused several of the blocks to fall, striking Carter in the head, neck, shoulder, and back. It was Carter's testimony that he would have been clearly visible to the forklift operator all the time that he knelt near the scaffold.

Hervan Montiel, the Senate employee who operated the forklift, testified as plaintiff's witness and recounted the series of events as follows:

I remember the day of the accident. My tractor was parked. I tried to move the arm of the tractor towards the scaffold. And on my right side a person was coming by, and since he didn't stop, I stopped the arm of my tractor. He went underneath and he went to my left side. I waited for him to go away at least some eight or ten feet. And when he was no longer in front of me I continued with my concentration with the job that I was doing. I remember that when I put the box of the mix on one side then when I was taking out the forks I heard that someone screamed or yelled. And I saw what happened, the man was on the

ground. And that's all I remember.[1]

Montiel stated further that he did not use a pallet on the morning of the accident, which he knew might lead to the forks of the forklift breaking the cube of cinder blocks, upon which he placed the pan of mortar.

Both Carter and Montiel denied having said anything to one another as they proceeded with their respective tasks. Carter explained, "[W]hen you're working construction you don't think to ask a guy to stop laying brick while you look for fittings." He did not believe his actions were unsafe. Montiel acknowledged that he thought the placement of the block on the scaffold created a dangerous situation.

Senate put forth the testimony of Stephen Fournier, an expert in civil engineering, who investigated "the circum- stances" of Carter's injuries "to determine if anybody associat- ed with the work acted in an unsafe or inappropriate manner." The exclusive source of his eyewitness information was Senate employees. Fournier testified that Carter put "himself in a position of danger," but also that Montiel increased the risk of injury by operating the forklift without a pallet. He was equivocal in his opinion as to whether Montiel had a duty to warn Carter of danger. Fournier stated that, if Montiel knew Carter was in a position of danger, he had a duty to warn; but, then, in response to questions posed by Senate's counsel, he remarked that Montiel "acted reasonably" in continuing with his work, without communicating with Carter.

At the close of the evidence, Senate moved for judgment upon the assertions that Carter acted negligently, but Montiel did not. Carter responded that Montiel breached a duty to warn and a duty to stop the forklift operation once he saw Carter kneeling by the scaffold. He raised the specter of the last clear chance doctrine. The circuit court reserved ruling

---

1. As the trial court noted, Carter and Montiel differed in their descrip- tion of the sequence of events. Carter said that the forklift began its operation once he had already stopped near the scaffold. According to Montiel, however, he began the operation, stopped to let Carter pass, then continued his work.

on the motion, stating, "[T]here are facts that would sustain a finding of negligence and facts that would find there was no contributory negligence." The judge also noted his uncertainty as to whether the last clear chance doctrine applied. Accordingly, the court denied Carter's motion for judgment, which he premised on the last clear chance doctrine.

Preparing the case for deliberation, the court instructed the jury on negligence, contributory negligence, and as follows:

The plaintiff has alleged that the Defendant had the last clear chance to avoid the injuries sustained by the Plaintiff. Before you can determine the issue of last clear chance you must first determine that the Defendant was negligent, second that the Plaintiff was contributorily negligent, and third, that the Defendant had a fresh opportunity of which the Defendant was aware to avoid the injury.

The jury returned a verdict in favor of Carter, finding that Senate was negligent through the actions of Montiel, Carter was contributorily negligent, and Senate had the last clear chance to avoid the accident. It awarded Carter about $66,000.00 in economic damages and $150,000.00 in non-economic damages.

Senate then moved for JNOV, with the principal assertion that Carter and Montiel committed their respective negligence simultaneously, so Senate could not be held to have squandered the final opportunity to avoid the accident. Also, Senate argued that Montiel did not have "superior knowledge" over Carter as to the risk at hand.

Carter rebutted both those assertions. He attributed greater knowledge to Montiel, who surveyed the scene from the height of the forklift cab and who worked with cinder blocks on a regular basis. Moreover, Carter chronicled the events as follows: (1) Carter negligently stooped near the scaffold; (2) Montiel negligently failed to warn him to leave the area; and (3) Montiel negligently continued with the forklift operation. With this sequence of events, Montiel was the final bearer of the accident and injury.

The trial judge engaged counsel in lengthy discussions about the facts of the case and the plethora of cases on point, but he was confident that, no matter how he ruled, the case would be appealed. Ultimately, the court granted Senate's JNOV, without much explanation.

## II.

Both Senate and Carter concede, for purposes of this appeal, that there were sufficient facts from which the jury could find that each of them acted negligently. That leaves them debating only whether Montiel could have avoided the accident-whether he held the last clear chance to transform the unfortunate hit to a near miss.

■■■ As this Court explained in *Burdette v. Rockville Crane Rental, Inc.*, 130 Md.App. 193, 216, 745 A.2d 457 (2000):

[T]he doctrine of last clear chance permits a contributorily negligent plaintiff to recover damages from a negligent defendant if each of the following elements is satisfied: (i) the defendant is negligent; (ii) the plaintiff is contributorily negligent; and (iii) the plaintiff makes "a showing of something new or sequential, which affords the defendant a fresh opportunity (of which he fails to avail himself) to avert the consequences of his original negligence."

The theory behind the doctrine is that "if the defendant has the last clear opportunity to avoid the harm, the plaintiff's negligence is not a 'proximate cause' of the result." *Id.* at 215, 745 A.2d 457 (quoting W. Prosser, Law of Torts § 66 (4th ed. 1971)).

■■■ "A fresh opportunity" is the operative phrase, for the doctrine will apply only if "the acts of the respective parties [were] sequential and not concurrent." *Id.* at 216, 745 A.2d 457. In other words, the defendant must have had a chance to avoid the injury after plaintiff's negligent action was put in motion. *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 637–38, 495 A.2d 838 (1985). The doctrine "assumes" that, after the primary negligence of the plaintiff and defendant, "the defendant could, and the plaintiff could not, by the use of

the means available avert the accident." *United Rys. & Elec. Co. v. Sherwood Bros.*, 161 Md. 304, 310, 157 A. 280 (1931). In this way, the defendant should have recognized and responded to the plaintiff's position of "helpless peril." *Baltimore & O.R. Co. v. Leasure*, 193 Md. 523, 534, 69 A.2d 248 (1949).

Our research revealed more than four dozen reported Maryland cases discussing the last clear chance doctrine. Its history in our State law dates back to 1868. *See Burdette*, 130 Md.App. at 215–16, 745 A.2d 457 (tracing the doctrine's roots to English common law); *Ritter v. Portera*, 59 Md.App. 65, 70–72, 474 A.2d 556 (1984) (same); *see also N. Cent. Ry. Co. v. State*, 29 Md. 420, 436 (1868) (first reference of the doctrine in Maryland law). The doctrine is more often described than applied because of the requirement that plaintiffs show a new act of negligence following their own actions.

In *Sears v. Baltimore and Ohio Railroad Co.*, 219 Md. 118, 148 A.2d 366 (1959), for example, the Court of Appeals declined to extend the doctrine to a plaintiff/appellant whose truck collided with a train as it crossed a set of tracks. The Court wrote:

> [T]here was no evidence sufficient to go to the jury in the present case to support a finding that, assuming the appellant's negligence, there was a time after such negligence when the appellee could have averted the accident and the appellant could not. Both the train and the truck were moving at the time of the impact, and it is clear that if the appellee was negligent, its negligence was concurrent and not sequential. We have said that in order for the rule to be applicable "[s]omething new, or independent, must be shown, which gave the defendant a fresh opportunity to avert the consequences of his original negligence and the plaintiff's contributory negligence." Even though the operator of the appellee's locomotive saw the appellant's truck standing or moving slowly at a point close to the tracks, he had the right to assume that the appellant would stop before he reached the track upon which the train was proceeding. The appellant did not present any evidence to support an inference that the appellee had a "fresh opportunity" to

avert the consequences of his own contributory negligence in driving onto the tracks.

*Id.* at 125–26, 148 A.2d 366 (citations omitted).

Likewise, in *Quinn v. Glackin,* 31 Md.App. 247, 355 A.2d 523 (1976), this Court did not see a last clear chance in an accident between a girl on a bicycle and a motorist. The adult, Mr. Glackin, saw the child heading for the street from her driveway when he was about 100 feet away from the driveway. He applied his brakes when he was about thirty feet away from her. The injured child, Marie Quinn, conceded her own negligence, but sought refuge in Mr. Glackin's failure to see her sooner and his failure to warn her of the impending danger by blowing the horn. In her view, after she headed for the street, "there was then still time for [Mr. Glackin] to avoid the accident." *Id.* at 251, 355 A.2d 523.

This Court disagreed:

> If the evidence in this case was sufficient to show any negligence at all on Mr. Glackin's part, and it is unnecessary to decide whether it was, then it was original negligence which continued, and concurred with the admitted negligence of Marie Quinn to cause her injury.

There could be no fresh opportunity available to Mr. Glackin to avoid the consequences of Marie Quinn's negligence until she did something negligent. Her approach down the driveway was not negligent, and did not then place her in a position of peril. Her lawful approach could not constitute notice to Mr. Glackin that she would fail to yield the right of way to him. A motorist on the favored highway has the right to assume that the unfavored driver will yield the right of way.

Marie Quinn's negligence—her failure to yield the right of way to a motorist on the favored highway—was followed almost instantaneously by the accident. The trial judge correctly ruled that there was no evidence to show that Mr. Glackin had a last clear chance to avoid the accident.

*Id.* at 254–55, 355 A.2d 523. Thus, we rejected plaintiff's attempt to split Mr. Glackin's negligence into separate acts of negligent warning and negligent doing.

In contrast, the premier example of the last clear chance doctrine at work is *Ritter v. Portera,* 59 Md.App. 65, 474 A.2d 556 (1984), which involved a group of young people and a moving car. One of the teenagers perched on the hood of the car, and, as the driver sped up and drove away, she fell off the car, grabbed hold of the bumper, and was dragged at least twenty feet. Clearly, the driver was negligent in inviting people to sit on the hood of his car, but the injured person was also negligent in accepting the invitation. For the trial court, the contributory negligence barred the teenager's claim against the driver.

This Court reversed, however, reasoning that the injured teenager was not a "proximate cause of the accident." Instead, the driver "could have, and indeed should have, refused to move the vehicle while [the teenager] was so situate[d]." *Id.* at 72, 474 A.2d 556. Because the driver's negligence was so clearly sequential to whatever negligence preceded it, the injured teenager was entitled to pursue a claim for recovery. *See also Payne v. Healey,* 139 Md. 86, 114 A. 693 (1921) (invoking the last clear chance doctrine to allow evidence to go to a jury that showed that train operators were responsible for a collision between an automobile and a semaphore).

## III.

Carter faces the same hurdle as the plaintiffs in the cases discussed above. He cannot recover if the facts show only that he and Montiel both acted unreasonably, which would create only a concurrent negligence. Rather, Carter must show that the jury could have read the facts to mean that Montiel was negligent, Carter was negligent, and then Montiel had a new opportunity to change the course of events.

We conclude that the facts could have been read to show the sequential course of events that Carter needs to defeat the grant of JNOV. The jury could have found from the testimo-

ny that Montiel negligently first placed the cube of cinder blocks on the forklift without using a pallet and placed them on the scaffold, possibly breaking some; that later, with the pan of mortar on the forklift, he saw Carter kneeling by the scaffold in harm's way and failed to warn him of the danger; and that, following a pause in his operations, he negligently proceeded to place the mortar on the scaffold, causing the cinder blocks to fall. There are various points along this continuum of negligent conduct where the jury might have interjected Carter's negligence, but the bottom line is that the jury could have concluded that Montiel held the final opportunity to avoid the accident.

Beyond the doctrinal phrases of "last clear chance," "fresh opportunity," and "helpless peril," the jury could have found from the evidence in this case an account of two men acting dangerously on a construction site, but with one man having superior knowledge of the impending danger, as well as the superior ability, the last clear chance, to avert it. Montiel was not like the train conductor in *Sears,* who could only watch the truck impede on the railroad tracks, or the driver in *Quinn,* who had no real opportunity to avoid hitting the child rushing at him. Montiel controlled the final force that brought about this accident—the forklift. Like the young driver in *Ritter,* Montiel had a "fresh opportunity" to avoid the accident. He could have refused to move his vehicle as long as Carter remained in danger. Because the jury could have lawfully found in favor of Carter, the circuit court should have respected its decision, and we now reinstate that verdict.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED, WITH INSTRUCTIONS TO REINSTATE THE JURY'S VERDICT.**

**APPELLEE TO PAY COSTS.**

KRAUSER, J., files an opinion concurring in the result in which MURPHY, C.J., joins.

JAMES R. EYLER, J., dissents and files an opinion in which DAVIS, KENNEY, and DEBORAH S. EYLER, JJ., join.

Concurring Opinion by KRAUSER, Judge, which MURPHY, C.J., joins.

I concur in the result reached by the majority but I regret that this Court did not take the opportunity presented by this case to modify Maryland's last clear chance rule and rid it of an odious doctrinal accretion: the requirement that the plaintiff must first prove that the defendant was negligent before the defendant had the last clear chance to avoid injuring the plaintiff.[2] It is an "accretion" because it was not part of the last clear chance rule when that rule was first promulgated. It is "odious" because regardless of how helpless the plaintiff, how perilous his predicament, and how blameworthy the defendant's conduct, the plaintiff cannot recover unless he or she can first show a preliminary act of negligence by the defendant.

This factitious requirement has no intellectual genealogy. It owes its perpetuation to the reflexive application of precedent, not to the reflective application of policy. Indeed it serves no discernible public policy, though it undermines a few, as it exculpates the tortfeasor, no matter how egregious his negligence, while inculpating the tort victim, no matter how slight his fault. This criticism, some will no doubt point out, is also applicable to the doctrine of contributory negligence itself. That may be, but in last clear chance cases this criticism is more telling. For, in sharp contrast to a typical negligence tortfeasor, a last clear chance tortfeasor knows, before acting, who his likely victim is, the probable conse-

---

**2.** Maryland's last clear chance rule requires the following elements to be satisfied before a plaintiff can recover: "(i) the defendant is negligent; (ii) the plaintiff is contributorily negligent; and (iii) the plaintiff makes 'a showing of something new or sequential, which affords the defendant a fresh opportunity (of which he fails to avail himself) to avert the consequences of his original negligence.'" *Burdette v. Rockville Crane Rental, Inc.,* 130 Md.App. 193, 216, 745 A.2d 457 (2000) (quoting *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 638, 495 A.2d 838 (1985)).

quences of his actions, and the helpless state of his victim. Consequently, last clear chance cases often involve an element of callous indifference and sheer recklessness that is missing in ordinary negligence cases.

What is more, this requirement was not an element of the last clear chance rule as that rule was originally conceived. The last clear chance rule was first articulated in *Davies v. Mann*, 10 M. & W. 546, 152 Eng. Rep. 588 (Ex. 1842), *cited in* Charles A. Keigwin, *Cases on Torts* 276–77 (3rd ed. 1929). In that case, the plaintiff left his "fettered" donkey on a public highway. It was then run over by the defendant's wagon when he ignored the donkey's peril. But the facts of *Davies* are best summed up by the case itself:

> The plaintiff fettered the fore feet of a donkey and turned the beast into a public road to graze. The defendant's wagon came down the road at what a witness called a smartish pace and on a slight descent ran down the donkey, which was unable to get out of the way and soon afterwards died from the injuries caused by the collision.

*Id.* (footnote omitted).

Concluding that the defendant was liable for the plaintiff's loss despite the plaintiff's negligence in leaving a "fettered" donkey on a public road, the *Davies* court declared:

> [A]lthough there may have been negligence on the part of the plaintiff, yet, unless he might, by the exercise of ordinary care, have avoided the consequences of the defendant's negligence, he is entitled to recover; if by ordinary care he might have avoided them, he is the author of his own wrong.... All that is perfectly correct; for, although the ass may have been wrongfully there, still the defendant was bound to go along the road at such pace as would be likely to prevent mischief. Were this not so, a man might justify driving over goods left on a public highway, or even over a man lying asleep there, or the purposely running against a carriage going on the wrong side of the road.

*Id.*

In finding the defendant negligent, the court did not consider whether the defendant had committed a preliminary act of

negligence but only whether he had the last clear chance to avoid the accident. Unfortunately, the lesson of this seminal case has been obscured by the adoption of a wholly gratuitous requirement that bears not at all on the question: Did the defendant have the last clear opportunity to avoid the accident but chose not to, knowing the plaintiff's helpless and perilous position?

We are but one of a few states that still adheres to the doctrine of contributory negligence, a doctrine that most other states have found too harsh and pitiless to apply. The last clear chance rule was formulated to reduce, in some small measure, the severity of that doctrine. But, in adopting that rule, we have needlessly limited its application by pointlessly requiring a deserving plaintiff to jump through an additional hoop to have any hope of recovery.

Had we seized the opportunity to recast the last clear chance rule so that it comported with its original formulation, we would not be alone. We would be joining at least one other contributory negligence state, North Carolina. Guided by *Davies v. Mann,* the Supreme Court of North Carolina in *Vernon v. Crist,* 291 N.C. 646, 231 S.E.2d 591 (1977) declared:

> If defendant had the last clear chance to avoid injury to the plaintiff and failed to exercise it, then his negligence, and not the contributory negligence of the plaintiff, is the proximate cause of the injury. This interpretation of the doctrine is in keeping with the theory behind the original English 'Fettered Ass Case,' *Davies v. Mann,* 10 M. & W. 547, 152 Eng. Rep. 588. 'The only negligence of the defendant may have occurred after he discovered the perilous position of the plaintiff. Such 'original negligence' of the defendant is sufficient to bring the doctrine of the last clear chance into play if the other elements of that doctrine are proved.' *Exum v. Boyles,* supra at [272 N.C. 567] 576–77[,] 158 S.E.2d at [845,] 853 [(1968)].

*Id.* at 596.

The North Carolina court stressed:

For the doctrine to apply it must appear 'that after the plaintiff had, by his own negligence, gotten into a position of helpless peril (or into a position of peril to which he was inadvertent), the defendant discovered the plaintiff's helpless peril (or inadvertence), or, being under a duty to do so, should have, and, thereafter, the defendant, having the means and the time to avoid the injury, negligently failed to do so.' [*Exum v. Boyles,* supra at 576, 158 S.E.2d at 853].

*Id.*

And finally, this wholly unwarranted obstacle to recovery has led our courts to stretch and strain to find acts of preliminary negligence by the defendant, where none exist, but where the injuries of the hapless plaintiff are great and the conduct of the defendant particularly censurable. The creativity displayed by these courts in trying to squeeze a square peg into a round hole has been impressive (and, in my view, laudatory) but I hope at some later date will become entirely unnecessary.

Dissenting Opinion by JAMES R. EYLER, Judge, which DAVIS, KENNEY, and DEBORAH S. EYLER, JJ., join.

I respectfully dissent. To help create a mental picture of the scene, to understand the negligent acts of the parties, I shall begin with some general background information.

The following description is derived from appellant's testimony. The incident occurred on the construction site for a building which, when finished, would house a Safeway store. As is typical in that situation, the work of subcontractors was coordinated, and more than one subcontractor worked on the site at the same time.

During the time period leading up to the day of the incident, appellant's employer, a plumbing subcontractor, was on the site, and appellee, a masonry subcontractor, was on the site. It is unknown whether other subcontractors were also working on the site. At that time, the building was in its early stages of construction. Concrete footers had been poured, defining the footprint of the building. Cinder blocks had been laid on

the footers to grade height at some or all of the wall locations. Appellee had erected a three level scaffold from one corner of the building to another corner of the building for the purpose of laying cinder blocks to build a wall to its desired height. Appellant's employer, including appellant, had finished approximately 50 per cent of the initial, pre-building shell, plumbing work which consisted of trenching, laying pipes, and backfilling to cover the pipes. The pipes were to serve as water supply and drain lines. The ends of the lines at various locations were "stubbed," meaning that they extended above ground level, to eventually be connected to the internal plumbing of the building, after the pouring of a concrete slab and the erection of the building shell and installation of internal plumbing.

According to appellant, on the day of the incident, he was working in a trench laying pipe approximately 30 to 40 feet from where appellee's employees were constructing a block wall. The scaffolding was three levels high, but the wall was in its early stages and the masons were working off, or slightly below,[3] the first level of the scaffolding, which was 5 to 7 feet in height. Appellant walked to an area near the scaffolding to look for pipe fittings in bins left in that area.

Appellant testified that he saw the forklift in question as it entered the building footprint. He explained that he knew the forklift would deliver materials to the scaffolding for the masons and he knew the path the forklift would take. He knew this because the forklift had to take the same path each time in order to maneuver between the stubbed pipes and other obstructions within the footprint. Appellant testified that he went to the bins and kneeled, approximately 5 to 6 feet from the scaffolding. While there, he knew that the forklift had moved to its destination, approximately 8 to 10 feet behind him, and was unloading its materials. Appellant also

---

**3.** It is clear that cinder blocks and other materials used by the masons were located on the first level. There was testimony that there were "hangers" on the scaffold, lower than the level holding the materials, so that workers could stand on the hangers while laying the blocks. It is unclear where the workers were standing at the time of the incident.

knew that blocks were on the scaffolding and that masons were working from the scaffolding. According to appellant, there were no obstructions between him and the forklift operator and, therefore, nothing to prevent either one from seeing the other.

Appellant had worked as a plumber for 24 years, mostly commercial plumbing, similar to the job that he was working on at the time of the incident. He stated that it was typical for plumbers and masons to work on a construction site at the same time. Appellant testified that, on construction jobs, a worker typically does not ask another subcontractor's employee to stop work in order for the worker to get something because each worker is responsible for not putting himself or herself in a dangerous position. He did not think he had put himself in a position of danger, however, because he had been around scaffolds on many occasions and had never seen whole blocks fall. He acknowledged the potential for danger and that pieces of block frequently would fall while masons were working. Appellant did not see what struck him prior to impact. He did not know what caused the blocks to fall.

Hervin Montiel, the forklift operator, testified to the following. He approached the scaffolding with a mortar pan full of mortar to be placed on the first level of the scaffolding. He stopped, approximately 12 feet from the scaffolding, at the location from which he planned to move the boom to which the forks were attached to place the pan. While stopped, he noticed a man walk by, underneath the boom. He waited until the man was 8 to 10 feet away. At that point, he ceased watching the man, concentrated on placing the mortar pan, and did so. After he set the mortar pan on the scaffolding, he heard someone yell. Montiel did not see appellant being struck. When he saw appellant lying on the ground after being hit, appellant was 10 inches from the edge of a hanger which extended approximately two feet from the scaffolding. Montiel did not testify as to how far appellant was from the forklift.

Some of the questions Montiel was asked concerned the situation as it existed on the day of the incident; others were general questions, about the usual performance of his work. With respect to the specifics of the day of the incident, Montiel testified that he did not see any broken blocks on the scaffolding. Also, he did not see any blocks fall. Speaking generally, he acknowledged that, when blocks are placed on scaffolding by a forklift, particularly without a pallet, blocks sometimes break. The blocks on the scaffolding in question on the day of the incident were placed there without a pallet, by inserting the forks through the holes in the bottom layer of blocks to be moved. Montiel acknowledged it was possible that broken blocks were on the scaffold. Again speaking generally, he stated that, when a mortar pan is placed on scaffolding, the scaffolding may vibrate, sometimes causing blocks to fall. He also acknowledged that the possibility of blocks falling would be greater if there were broken blocks on the bottom of the stack of blocks. Montiel testified that, after the man walked by, he continued with his work. He did not think the man, appellant, was in a place of danger.

Stephen Fournier, a professional engineer, testified as an expert witness on behalf of appellee.[4] On direct examination, Fournier described the situation as it existed leading up to the incident as "normal." He acknowledged that placing a mortar pan on scaffolding could cause material to fall, including blocks. Speaking generally in terms of what constituted good practice, and not the specifics as they existed at the time, he opined that appellant violated good construction practice by placing himself in an area where there was a potential hazard of falling material.

On cross-examination, Fournier was asked several hypothetical questions. In essence, Fournier testified that, assuming: (1) there were broken blocks on the scaffolding; (2) that they were on the bottom of the stack of blocks; and (3) that placing

---

4. To understand why Fournier was asked various hypothetical questions, it is helpful to point out that no one saw a block fall and hit appellant, nor did anyone offer direct evidence why blocks fell.

the mortar pan caused vibration, it would create an unstable condition. This possibility would be foreseeable by an experienced worker, including Montiel. Further assuming that Montiel knew appellant's location and knew that it was a position of danger, then Montiel had a duty to warn appellant and to not proceed with his work.

On redirect examination, Fournier testified that, if Montiel did not know there were broken blocks on the scaffolding and he believed appellant was at least 5 feet from the scaffolding, he could continue with his work. If Montiel subjectively believed that appellant was in a position of danger, Montiel should have stopped until appellant left the position of danger.

The above constitutes the testimony relevant to the issue before us. The jury found that appellee was negligent, appellant was negligent, and that the act of negligence of each was a proximate cause of the incident. The only question before this Court is whether the last clear chance doctrine was applicable on these facts.

In order for last clear chance to apply under Maryland law, there must first have been acts of negligence by both the plaintiff and the defendant, each proximately causing the incident in question. If a defendant is primarily negligent, and a plaintiff is contributorily negligent, the plaintiff's action is barred. That bar does not exist if the defendant committed an act of negligence different from that which resulted in a finding of primary negligence at a point in time after the plaintiff has been contributorily negligent, and the new act of negligence can be said to supersede the plaintiff's act of contributory negligence. Thus, for last clear chance to apply, we have the well settled requirement, acknowledged by the majority, that a defendant must have committed sequential acts of negligence. *Burdette v. Rockville Crane Rental, Inc.,* 130 Md.App. 193, 216, 745 A.2d 457 (2000). The first act gives rise to primary negligence. The second act must occur at a time when the plaintiff can not avoid the accident. See *Kassama v. Magat,* 368 Md. 113, 133, 792 A.2d 1102 (2002) (quoting MPJI section 19:12 (2d ed. 1984)). This is sometimes

referred to as the plaintiff being in a position of helpless peril while the defendant has a fresh opportunity to avoid the accident. *Id.*

In this case, appellant's negligence theory rested on a single negligent act: that Montiel placed the mortar pan on the scaffolding, without warning appellee, when he knew or should have known that there were broken blocks on the scaffolding, thus creating an unstable condition, which resulted in a block or blocks falling on appellant. Appellee's contributory negligence against appellant also rested on a single act of negligence: that he placed himself in a position that he knew or should have known was dangerous and remained there with knowledge of the forklift's operation. Obviously, the jury found that appellant should have known that he placed himself in a dangerous position and that Montiel should have known the same.

The relevant point is that, while both parties were negligent, the negligent acts were concurrent. The only act of Montiel's negligence was placing the mortar pan on the scaffolding, when he knew or should have known that it might cause blocks to fall, and that appellant was in a zone of danger.

On appeal, appellant does not argue to the contrary. Indeed, he could not make a contrary argument because no evidence of any other act of negligence was presented. Specifically, the majority's theory that Montiel may have committed a preliminary separate act of negligence in placing the blocks on the scaffolding, without using a pallet, has not been argued by appellant. The reason for that is clear: it has no support in the record. In fact, the only evidence on that point was that placing the blocks, without a pallet, was normal. A jury finding to the contrary, had it been made, would have been based on pure speculation. At trial, the sole point of the evidence that there was or might have been broken blocks on the bottom of the stack of blocks was to show instability in the stack and to show foreseeability of an accident when the mortar pan was placed on the scaffolding. The majority's

theory as to what might have been the evidence, findings, and argument is not this case.[5]

What appellant does argue on appeal is that the jury could have found that Montiel's failure to warn was a negligent act separate from his conduct of placing the mortar pan on the scaffold. Certainly, a failure to warn could, depending on the facts, constitute a negligent act separate from another negligent act, but here the negligent act was the conduct in placing the mortar pan while not giving a warning. The warning was not separable from the conduct. A warning would not have sufficed had Montiel continued with his conduct. Montiel should not have proceeded with his work until appellant left the area. It was his conduct that was the negligent act proximately causing damages.

Moreover, even if the failure to warn and placement of the mortar pan could be viewed as two acts, they were contemporaneous acts that continued up to the time of injury and were concurrent with the negligent act of appellant, which also continued up to the time of injury. The evidence indicates that Montiel did not have actual knowledge that broken blocks were on the scaffolding. Montiel thought that he was proceeding safely. He did not subjectively believe that appellant was in danger or that appellant was in a position from which he could not have readily removed himself. Appellant did not subjectively believe that he had placed himself in a position of actual danger; if he had, he could have removed himself. He had actual knowledge of the forklift's operation. Both parties admitted almost the same awareness of the objective facts, one difference being that Montiel did not acknowledge that he knew appellant's location just prior to the incident while appellant acknowledged that he knew Montiel's location.

---

5. Even if there had been a scintilla of evidence that Montiel negligently placed the blocks on the scaffolding prior to appellant's arrival in the area, the result would be the same. Neither party believed appellant was in peril. Appellant was not helpless and could have removed himself at any time prior to the injury. Montiel had no fresh opportunity to avoid the accident.

In summary, both parties had the same objective knowledge and the same subjective beliefs. Appellant could have taken himself out of a position of danger at any time. Contrary to the statement in the majority opinion, appellant acknowledged greater awareness of the objective facts than did Montiel. Specifically, as mentioned above, appellant acknowledged that he knew the location of the forklift and that it was unloading, while Montiel did not acknowledge that he knew the location of appellant. Each party committed a continuing act of negligence during the same period of time.

Montiel, like the defendants in *Sears* and *Quinn*, discussed in the majority's opinion, assumed that appellant had moved on and was not in a position of danger. Unlike *Ritter*, relied on by the majority, a case in which the defendant knew the plaintiff was sitting on the hood of the defendant's car when the defendant moved forward, Montiel did not know appellant was in a position of danger. Montiel should have known. See *Benton v. Henry*, 241 Md. 32, 215 A.2d 226(1965) (plaintiff negligently jumped on an ice cream truck's running board; defendant operator of truck negligently failed to detect plaintiff's presence but did not commit a new act of negligence by operating the truck with the plaintiff on the running board). A continuing act of negligence is not a new sequential act. See *Myers v. Estate of Alessi*, 80 Md.App. 124, 128–29, 560 A.2d 59(1989) (continued failure to diagnose a disease is not a new act of negligence).

I would affirm the judgment.